**CITY OF WESLACO v. TURNER et al.**

No. 2933.

Court of Civil Appeals of Texas. Waco.

Feb. 6, 1951.

Rehearing Denied March 22, 1951.

waters of said lake. At the conclusion of plaintiffs' testimony, on motion, the court rendered judgment that plaintiffs take nothing against the cities of Pharr, San Juan, Alamo and Donna, and overruled similar motions on behalf of the cities of Weslaco, McAllen and Mission. At the conclusion of the testimony offered by the remaining defendants the court rendered judgment in favor of the cities of Mission and McAllen and against the city of Weslaco. The decree as modified under date of March 8, 1950, perpetually enjoined the city of Weslaco, after June 1, 1950, from "receiving, collecting and discharging into the waters of Llano Grande Lake any organic substance or other matter in solid form derived from the processes of canning, dejuicing, or dehydrating, any citrus fruits, or parts thereof, or any products and substances derived therefrom, which are physically susceptible of being screened and separated from the liquid waste derived from such processes; and from mediately or immediately receiving, collecting and discharging into the waters of said lake any liquid waste derived from such processes, which has not been so aerated, filtered, oxidized or chemically treated as to have been rendered inert and harmless, and incapable of polluting and contaminating the waters of said lake." The City of Weslaco appealed from the judgment against it and the appellees, who were the plaintiffs below, appealed from the judgment in favor of the remaining defendants.

Smith & McIlheran, and Garland F. Smith, City Atty., all of Weslaco, Archer & Archer, and L. Hamilton Lowe, all of Austin, for appellant.

Hill, Lochridge & King, Mission, Polk & Polk, Pharr, Davenport & Ransome, Brownsville, Cox, Patterson & Freeland, McAllen, Louis T. White, Alamo, Strickland, Wilkins, Hall & Mills, Mission, for appellees.

TIREY, Justice.

This is an injunction suit. Fred W. Turner and other land owners whose property bordered on Llano Grande Lake brought this suit against the cities of Weslaco, Donna, Alamo, San Juan, Pharr, McAllen and Mission for the purpose of permanently enjoining each of them from discharging organic substances derived from the process of canning citrus fruits into the

This record is voluminous. The testimony tendered exceeds 1000 pages, exclusive of exhibits. (A portion of the facts are stipulated. These stipulations cover pages 48 to 87, inclusive, in the transcript.) We shall later quote those that we think are pertinent. The court, on request, made and filed findings of fact and conclusions of law. These requests and the court's findings and orders thereon cover pages 173 to 230, inclusive, of the transcript. These will be quoted where pertinent.

Plaintiffs grounded their cause of action on the basis that the City of Weslaco and the six other cities herein named are polluting Llano Grande Lake, a public body of water adjacent to the property owned by

the plaintiffs, and that such pollution is in violation of certain statutes of our state, thereby creating a public nuisance, and that the plaintiffs are entitled to maintain this action in the public interest as well as for themselves on account of the special injuries they have suffered from such nuisance, and that they are entitled to have such nuisance abated by injunctive relief. Alternatively, plaintiffs sought damages.

The City of Weslaco, among other things, asserted the following affirmative defenses: (1) that the sewage drain used by it had been in operation for more than fifteen years, and any damages resulting therefrom was of a permanent nature and arose prior to the year 1936; (2) the two and four year statutes of limitation were pleaded, Vernon's Ann.Civ.St. arts. 5526, 5529; (3) the damages suffered, if any, accrued to plaintiffs' predecessors in title; (4) that the waters of Llano Grande Lake are not public, but private; (5) that the lands of the plaintiffs are all subject to easements for drainage purposes; (6) the doctrine of estoppel; (7) that the sewage system used is the best obtainable and the use thereof in accordance with the best known methods; (8) the doctrine of necessity and the balancing of equities.

Stipulations state in part that all the land lying underneath the levees between which the floodway and drainage ditch involved herein is situated and the entire bed of Llano Grande Lake and all land lying between said levees from a point more than a mile west of Mission, Texas to the Cameron County line, are encumbered with easements originally purchased from the then owners of the land by Hidalgo County, Texas, or Hidalgo County Drainage Dist. No. 1, for a valuable consideration paid to the then owners of the property covered by such easements. These easements gave the grantee the right of ingress and egress upon the land and the right to construct, operate and maintain "(1) a suitable floodway for handling, flowing, carrying, diverting, impounding and controlling flood and drainage water or waters, together with the right to maintain the same free of underbrush, and the right to construct, operate and maintain thereon suitable drainage ditches, spoil banks, bridges, telephone lines, drainage structures, or other structures, in connection with the operation and maintenance of said floodway, as grantee, and its assigns, may from time to time deem necessary, on the tract or tracts hereinafter described and designated: 'Floodway'; and (2) suitable levees, together with the right to use so much of said land for borrow in connection therewith, and the right to construct and maintain thereon suitable roadways, fences, gates, cattle guards, telephone lines, ramps and road crossings, irrigation and drainage structures, bridges, drainage ditches, irrigation canals, siphons, or other structures in connection with the operation and maintenance of said levees, or floodway adjacent thereto, as grantee and its assigns may from time to time deem necessary on the tract or tracts hereinafter described and designated: 'Levee'."

These easements executed by the owners of the land covered the levees, bed of Llano Grande Lake and land lying between such levees and were executed prior to the institution of this suit, some of such instruments having been executed as early as 1912. The easements were acquired either from the American Rio Grande Land and Irrigation Company, a private corporation, or from owners deraigning their title from such corporation. For the acquisition of such rights granted by such instruments as well as for construction of floodway and drainage ditch lying between such levees and for the construction of the levees themselves and other appurtenances, Hidalgo County and Hidalgo County Drainage Dist. No. 1 has expended more than two and a half million dollars, which does not include any of the amounts expended by the International Boundary and Water Commission. Ever since the floodway and drainage ditch above mentioned has been in existence, it has been used by the cities herein named with the knowledge and acquiesence of Hidalgo County and Hidalgo County Drainage Dist. No. 1.

We quote a part of the findings of fact made by the trial court:

"2. Said Llano Grande Lake is a 'public body of surface water of this State', and is fed by a stream which flows through and is in part the property of Hidalgo County, a subdivision of the State of Texas, and discharges through the stream called Arroyo Colorado into a bay or salt water lagoon of the State of Texas called Laguna Madre, which is an arm of the Gulf of Mexico, in which the tide ebbs and flows. It was originally one of a series or chains of resacas, lakes and channels, which diverged from the river Rio Grande near the site of defendant City of Mission, in the southwestern portion of Hidalgo County, Texas, and continuing thence eastwardly in consecutive series or sequence roughly parallel with the course of the river Rio Grande; which chain or sequence of lakes and channels has, from time immemorial, constituted a distributary of the river Rio Grande, and has always carried a major portion of its surpus and overflow waters in time of flood; and defendants, the Cities of Mission, McAllen, Pharr, San Juan, Alamo, Donna and Weslaco are located in that order from west to east, and at irregular intervals over a distance of approximately thirty miles, and on a line roughly parallel with, and lying northward from said series of resacas, lakes and channels.

"3. Beginning about the year 1912, and at intervals since, Hidalgo County Drainage Dist. No. 1 a public municipal corporation of the County of Hidalgo and the State of Texas; the County of Hidalgo, in said State (aided by remission of certain taxes by the Legislature of Texas); and latterly the International Boundary Commission for the United States and Mexico, have successively improved such series of channels, lakes and resacas, so situated westwardly from and above said Llano Grande Lake by building levees on either side of such natural flood and drainage way so as to confine surplus and overflow waters of the Rio Grande between such levees in time of flood; and have constructed a large ditch, or 'pilot channel' along the lowest ground between said levees, thereby draining said former lake and resacas, and confining the normal flow of water through such floodway to said improved ditch or 'pilot channel', which discharges into said Llano Grande Lake at a point southeasterly from defendant City of Donna, and at the head, or westerly extremity of said Llano Grande Lake. This 'pilot channel' is fed by a series of artificial drainage ditches, through which waste and storm waters from defendant cities, and surplus irrigation and drainage waters from a large acreage of irrigated farm and orchard lands, are drained through openings or 'structures' on said floodway levees into said 'pilot channel', and thence by gravity flow into said Llano Grande Lake.

"4. Said Llano Grande Lake is a body of fresh water between five and six miles long and from 300 feet to 600 feet in breadth; which has an average depth of about ten feet, and a maximum depth of more than 30 feet. It drains into Arroyo Colorado, south of the City of Mercedes, 'El Fuste'. The physical shape of the lake is such that it operates as a settling basin for nearly all of the suspended solids flowing into it from the 'pilot channel' and drainage ditches above described. Organic substances from citrus cannery 'liquid waste', as above described, reach the waters of the lake either dissolved or in fine suspension and in a highly unstable condition, and since the process of stabilization requires a definite amount of oxygen, this oxygen is taken from that already in the waters of the lake; or from that which later comes into the waters of this lake. This oxygen, by reacting with the oxidizable organic materials in the waste, leaves the waters deficient of free oxygen in solution; and, as a result, causes death to fish and other types of aquatic life. Due to its high content of organic material derived from such 'liquid waste', another type of reaction also takes place in the waters of the lake. This is termed 'anaerobic action', in which organic materials sinking to the bottom of the lake are acted upon by 'anaerobic' bacteria; and the resulting reaction produces immense quantities of hydrogen sulfide, giving off a characteristic rotten egg odor; thereby causing clouds of evil-smelling gases carrying a

reek of foul and fetid odors to form above the waters of the lake.

"5. The general slope of the area in which Llano Grande Lake and defendant cities are located is toward the east and northeast, with the consequence at the floodway, in which said lake is situated forks at its easten extremity; its normal outlet and the southern prong of the 'floodway being eastward into Arroyo Colorado, while its northern prong and 'pilot channel' called the 'North Floodway' extend north and thence northeast, carrying drainage water, and, in time of flood, the greater portion of the Rio Grande flood waters to Laguna Madre at a point several miles north of the mouth of Arroyo Colorado, through which the waters of the southern prong are discharged. Defendant cities (except the City of Mission) are all so situated that the discharge from their storm sewers, and other drainage, may be directed southerly into the 'North Floodway' at points below the chain of lakes. The cities of Donna and San Juan have severally stipulated that no industrial waste is discharged by said cities into Llano Grande Lake, or into the 'pilot channel' above said lake, and that all industrial waste received, collected and discharged by said cities, respectively is discharged through ditches extending northwardly from said cities, and thence eastwardly into said 'North Floodway' below the chains of lakes.

\* \* \* \* \* \*

"7. Immediately prior to and at the time of the institution of this suit, all of the defendants were discharging the effluent from their domestic sewage disposal plants either into said 'floodway' and 'pilot channel' above mentioned, and thence by gravity flow into the waters of Llano Grande Lake, as in cases of the cities of Mission, McAllen, Pharr, San Juan and Alamo; into the head of said lake, in the case of the City of Donna; and in the case of the City of Weslaco, directly into the waters of said Llano Grande Lake; without such domestic sewage having received sufficient corrective treatment to render it inert and harmless; and incapable of polluting the waters of said lake; but this was due in part to war time shortages, and to rapid growth of said defendant cities; and has now been rectified or is in the course of being rectified; and should be fully corrected by the voluntary action of defendant cities, and without the equitable intervention of the court. Treated effluent from their domestic sewage disposal plants is still being discharged into said 'pilot channel' or directly into the waters of Llano Grande Lake, as above stated; but I find that where such domestic disposal plants are adequate for domestic needs and properly operated, such effluent is inert and harmless, and not calculated to pollute the waters of said lake.

"8. In addition to treated effluent from their domestic sewage disposal plants, above stated, defendants City of Alamo, City of Pharr, City of McAllen and City of Mission, are each collecting and discharging industrial 'liquid waste' from one or more plants engaged in large scale canning, dehydrating or otherwise processing vegetables and citrus fruits, and wash waters from vegetable and citrus fruit packing plants situated in said cities, respectively, into the 'pilot channel' above described, and through said 'pilot channel' into the waters of Llano Grande Lake; and defendant City of Weslaco is collecting and discharging such 'liquid waste' from eleven such citrus fruit and vegetable cannery and processing plants directly into the waters of Llano Grande Lake; and such industrial 'liquid waste' from citrus fruit and vegetable cannery plants, as so collected and discharged by defendant cities has at the several points of discharge, a dangerously high 'bio-chemical oxygen demand', that being the customary chemical test for the potentially pollutive qualities of a given waste; and such potentially dangerous characteristics cannot be removed from liquid waste discharged from citrus fruit and vegetable canneries and processing plants by treatment such as is accorded ordinary domestic sewage, or by any known chemical means, other than by its being subjected to the action of free oxygen from air or water, under favorable conditions, and for a relatively long period of time, which oxidizing treatment can be accomplished only by extensive dilution in

flowing, moving or otherwise agitated water containing free oxygen; or by extensive aeration and filtering in a special type of 'trickling filter' which, as compared with the customary treatment of ordinary domestic sewage, is relatively expensive both to operate and to build.

"9. Defendant City of Weslaco collects and discharges directly into the waters of said Llano Grande Lake industrial waste, including 'liquid waste', as above defined, from eleven citrus fruit and vegetable cannery and processing plants; such liquid waste flowing from the storm sewers of defendant City of Weslaco into the waters of said Llano Grande Lake through a ditch about four and one-fourth miles in length, untreated and undiluted, except as it is commingled with treated effluent from the domestic sewage disposal plant of defendant City of Weslaco, which is discharged through the same ditch at the same time. Population of the City of Weslaco, as shown by the 1940 United States census, was 6,683; its present estimated population is 10,150. Citrus and vegetable canning, packing and processing plants in said city represent a total capital investment of $3,695,424.00; employ a total of 1,823 persons, and have an annual payroll of $1,598,593.00.

"10. Defendant City of Weslaco collects and discharges directly into the waters of Llano Grande Lake a much greater quantity of 'industrial liquid waste' than is collected and discharged by either, or all, of said other defendants; and such discharge is without the benefit of the dilution factor, and 'self-purifying' tendencies which arise out of a long flow of such 'liquid waste' when commingled with water containing free oxygen; and the amounts of cannery and other citrus and vegetable wastes, so collected and discharged into the waters of Llano Grande Lake by defendant City of Weslaco during the months of the year when the cannery and other citrus processing plants in the City of Weslaco are in operation, are so long, contain such quantities of organic material, dissolved or in fine suspension, and have such a high 'bio-chemical oxygen demand', that such 'liquid waste' pollutes and contaminates the waters of Llano Grande Lake; and during such months of canning and citrus processing operations, the dissolved oxygen in the waters of the lake becomes so low that fish life cannot exist, and large numbers of fish die, thereby increasing the pollution of the waters of the lake; and enough anaerobic action takes place in the waters of the lake to cause huge concentrations of hydrogen sulfide to rise from the surface of the lake, emitting characteristic rotten egg odor; together with methane and other gases, all dangerous to human health and which make life unbearable to human beings residing on or near the banks of Llano Grande Lake; and such pollution renders the waters of said lake unfit for swimming, bathing, boating, fishing, and other forms of recreation, for which, prior to such contamination and pollution, it was suitable, used and fit and due to the size of the lake and the large population near its banks, its pollution has created a serious danger to the public health; and particularly to the health of plaintiffs and their families, in violation of the provisions of Article 4444, Rev.Civ.Stats. of Texas, and of Chapter 285, Acts of 48th Leg. of Tex. (1943) as amended by Chapter 240, Acts 49th Leg. of Texas, published unofficially as Article 698–b Penal Code.

"11. Population of defendant City of Alamo, as shown by the 1940 U. S. census was 1995. Its present estimated population, 4000. It collects and discharges industrial waste from only one canning plant, which waste is discharged through a dry ditch approximately 2½ miles in length, and the amount of waste is so small that it is believed not to enter the 'pilot channel', into which such ditch discharges, in appreciable quantity, if at all.

"12. Population of defendant City of Pharr was 4,784 by the 1940 United States census, and its present estimated population is 9,340. Said City receives, collects and discharges through its storm sewers, into the 'pilot channel' above mentioned, industrial waste from one tomato packing plant and ten plants which pack and ship fresh fruits and vegetables. Total investment in said plants is $679,058; these em-

ploy 2,683 persons, and have an annual payroll of $1,487,906.00. The point of discharge of said storm sewers is approximately one and a half miles south of said City of Pharr.

"13. Defendant City of McAllen had a population of 11,877 by the 1940 census, and has a present estimated population of 21,643. It receives, collects and discharges through its storm sewers and connecting ditch and into the 'pilot channel' above mentioned, and so, potentially, into Llano Grande Lake, untreated industrial waste from eight citrus and vegetable canning and processing plants, and from nine additional packing sheds which do a substantial amount of packing and processing of vegetables during the autumn, spring and winter months. The gross amount of industrial waste so collected and discharged by it is larger than that from either of the other defendant cities, other than the City of Weslaco. This industrial waste is raw and untreated, and has a dangerously high 'bio-chemical oxygen demand', and the only reliance for its stabilization before reaching the waters of Llano Grande Lake is that such waste flows for about 17-3/4 miles commingled with the waters of the 'pilot channel' before flowing into the head of said lake.

"14. Population of defendant City of Mission was 5,982, as shown by the 1940 United States census, and its present estimated population is 10,262. This defendant receives, collects and discharges industrial waste from five citrus and vegetable canning plants; which industrial waste, when so collected, is discharged through a vitrified pipe line, and a flowing ditch maintained by the International Boundary Commission, into the 'pilot channel' above mentioned, and so, potentially, into Llano Grande Lake. The industrial waste so collected and discharged is 'liquid waste', by which is meant that portion of the industrial waste from said citrus and vegetable processing plants which remains after solid matter has been removed therefrom by draining said waste through screen wire having not less than 40 openings to the square inch; and the industrial liquid waste thus discharged into and commingled with the waters of said 'pilot channel' flows into the waters of Llano Grande Lake at a point 23 miles distant from the point where it reaches said 'pilot channel', above said lake.

"Such liquid waste so discharged by defendant City of Mission into the 'pilot channel' has a high 'bio-chemical' oxygen demand, but due to its high dilution factor, at and immediately below the point of intake, the volume of flow in the 'pilot channels' at the point of discharge, and the distance which it must flow before reaching Llano Grande Lake, the stabilizing or 'self-purifying' action of the free oxygen in the waters of the 'pilot channel' tend to stabilize the diluted water and render it inert, or nearly so, before reaching the waters of Llano Grande Lake. The evidence is insufficient to show whether this stabilizing process has been completed before the waters of the 'pilot channel' have become overloaded, for purifying purposes by successive additions from industrial waste of other defendant cities flowing into said 'pilot channel' at points below."

In paragraph 6 of the findings we find the court's conclusion of law. We quote: "Plaintiffs, and each of them, are the owners, as pleaded by them, respectively, of the several tracts of land situated on the north bank of Llano Grande Lake, as described in plaintiffs' first amended original petition; and are entitled to maintain this action to abate a public nuisance affecting the waters of Llano Grande Lake, in the public interest, as well as for themselves, by reason of special injuries suffered by them from such nuisance, and their special interest in abating such nuisance by reason of their ownership of said lands situated on and riparian to the banks of said lake."

Since the trial court found that Llano Grande Lake was a public body of water within the meaning of the statutes and constitution of our state and granted the permanent injunction because such water was being polluted in violation of the provisions of Art. 4444, Vernon's Ann.Civ. Stats. and Art. 698b, Vernon's Ann.Penal Code; and since it is the contention of the City of Weslaco and the other defendants that Llano Grande Lake is a private body

of water as distinguished from a public body of water, this point of necessity must first claim our attention.

First of all we find the following stipulation:

"It is stipulated by and between the parties hereto that the Llano Grande Lake, upon which the homes of the several plaintiffs herein are situated is located and lies wholly within the boundaries of the Llano Grande Grant being a grant from the Crown of Spain to Juan Jose Ynojoso de Balli and wife Rosa Maria Ynojosa de Balli in the year 1790. Said grant was confirmed to the heirs and assigns of said grantees of the Crown of Spain by Act of the Legislature of the State of Texas approved February 10, 1852. 3 Gammel's Laws 941 et seq.

"Each and all of the plaintiffs own the land described in their petition as purchasers under said Juan Jose Ynojoso de Balli and wife, Rosa Maria."

The American Rio Grande Land and Irrigation Company, prior to 1912, by mesne conveyances, acquired title to the Llano Grande Grant and claimed title to said lake and the waters thereof as its own private property and exercised dominion and ownership over the same. About 1909 or 1910 there was organized in Hidalgo County a governmental corporation known as Hidalgo County Drainage Dist. No. 1, which embraced lands along the Rio Grande River and extending back therefrom a considerable distance, and including within its boundaries the floodway referred to in the trial court's findings of fact, and the lands now claimed by the plaintiffs in this cause, including the southern part of Llano Grande Grant and which included all of Llano Grande Lake. In 1912, the American Rio Grande Land and Irrigation Company, at that time the owner of the land of the plaintiffs, as well as being the owner of most of the land covered by Llano Grande Lake, as well as most of the Llano Grande Grant, joined by others, conveyed to Hidalgo County Drainage Dist. No. 1 certain property described in the deed for the purpose of using said property for drainage in said District No. 1. At the time such deed was given water was being discharged into the ditches and drains and conducted by natural flow through what later became the floodway and pilot channel referred to in the court's findings of fact, which flowed into said Llano Grande Lake. At that time the other cities named herein were using said drainage for making disposition of their excess waters, both flood and irrigation, and this excess was flowing by gravity into Llano Grande Lake from various points west from said lake for a distance of approximately thirty or forty miles. In January 1926, the American Rio Grande Land and Irrigation Company was the owner of the lands referred to above and it entered into a contract with the Commissioners Court of Hidalgo County and Hidalgo County Drainage Dist. No. 1, in which contract the county agreed to erect certain drainage structures and turn them over to Hidalgo County and the Hidalgo County Drainage Dist. No. 1, for which the county was to pay to the American Rio Grande Land and Irrigation Company $85 per acre for each acre of land occupied by levees. In said contract it was asserted among other things that the American Rio Grande Land and Irrigation Company was the owner of the fee simple title to the lands subsequently claimed by plaintiffs in this suit as a floodway, or was the owner of easements with rights to assign the same for drainage purposes. In said contract the American Rio Grande Land and Irrigation Company assigned to the county such easements as it had reserved for flood purposes on the land lying in such floodway and in Llano Grande Lake.

Llano Grande Lake is a part of a series of resacas (water holes) that diverge from the Rio Grande River a short distance from the City of Mission; the dam erected across the lower end of the lake dammed up water that would otherwise drain down the natural depression and that but for this damming action there would be no lake; the physical shape of this series of water holes or resacas has been changed, not only by this damming of the depression but also by successive improvements such

as deepening it into one continuous channel or pilot channel and the building of levees along the sides. This series of resacas as improved above, or west of, the lake is called the floodway, because the improvements were made primarily · as an outlet to contain and channel the excess floodwaters of the Rio Grande River and keep them off of valuable lands. Llano Grande Lake is fed by 122 openings into this floodway through which the ground waters from the adjacent lands are drained, as well as the industrial and domestic effluent of the seven defendant cities, the petroleum waste of Rado Refinery, citrus waste of Universal Colloids and others.

■ Since the Lake (or water holes) lay wholly within the boundaries of a privately owned grant of the plaintiffs' predecessors in title, we think the question as to whether the Lake is public or private is controlled by the laws of Mexico and Spain in force at the time the land grants from these sovereigns were made. This we understand to be the rule of our Supreme Court as announced in Miller v. Letzerich, 121 Tex. 248, 49 S.W.2d 404, points 1, 2 and 3, pages 407–408, 85 A.L.R. 451.

The effect of the foregoing decision is that the civil law under which such grants of land, now within the boundaries of Texas, were made, becomes the local law of Texas for the purpose of ascertaining the rights pertinent to such grants.

In State v. Cuellar, 47 Tex. 295, 305, we find this statement by our Supreme Court: " * * * it is the business of the courts of Texas to know and expound the laws pertaining to the rights to land situated in Texas, and here in suit, whether the laws upon which the rights to the land depend, were laws made by the State of Texas, by the Republic of Texas, by the State of Tamaulipas as part of Mexico, or by Spain."

Under the foregoing pronouncements of our Supreme Court we must look to the civil law to see if the grantees of the Spanish Crown took title to the Llano Grande Lake; and we think they did. See Manry v. Robison, 122 Tex. 213, 56 S.W. 2d 438; 9 Tex.Jur. 301–04; Mitchell v. Bass, 33 Tex. 259, 260.

We have not been cited to any provision of the Spanish law as it existed in 1790, which would have prevented the water holes and depressions existing on the property at said time from passing to the grantees. On the contrary we find in Law 31, Title 28, 3rd Partida, the following provision: "When a river changes its course, to whom will belong the bed where it formerly ran? Rivers sometimes take new courses abandoning their former beds and leaving them dry. And as disputes may arise about the right of property to the ground thus left, we say it will belong to the owners of the adjoining lands, in proportion to the extent of their estates upon the banks. And the owners of the lands through which the river makes its new bed, will lose the property in the soil it covers, which will now be of the same nature of the former bed, and will, like the river itself, vest in the public."

Our Supreme Court, in discussing this provision in State v. Grubstake Inv. Ass'n, 117 Tex. 53, 297 S.W. 202, 203, said: "The express purpose of · Law 31 is to make plain the ownership of river beds. It defines the status of the title, first, to the bed of the river with the waters flowing along it; second, to the bed after its abandonment by the waters of the river; and, third, to the bed along a new course carved out by the river. It vests title to the bed along which a river runs in the public. It provides that the adjoining owners will acquire title to ground left dry by a change in the river's course in proportion to their estates on the banks."

■ Since the waters of Llano Grande Lake consisted of a series of water holes at the time of the grant made in 1790, they could not have had any public significance at that time for the purpose of navigation, and since they were situated wholly on the land granted (in an abandoned river bed) they were a part of the land conveyed and as such passed from the Spanish Crown to the grantee. See Manry v. Robison, supra, point 4, 56 S.W.2d at page 442.

644

Moreover, the area that is now Hidalgo County was ceded to the United States and became a part of the State of Texas pursuant to the Treaty of Guadalupe Hidalgo in 1848. See 9 U.S.Stats. at Large 929. That statute reads in part:

"Article VIII. Mexicans now established in territories previously belonging to Mexico, and which remain for the future within the limits of the United States, as defined by the present treaty, shall be free to continue where they now reside, or to remove at any time to the Mexican republic, retaining the property which they possess in the said territories, or disposing thereof, and removing the proceeds wherever they please; without their being subjected, on this account, to any contribution, tax, or charge whatever.

\* \* \* \* \* \*

"In the said territories, property of every kind, now belonging to Mexicans not established there, shall be inviolably respected. The present owners, the heirs of these, and all Mexicans who may hereafter acquire said property by contract, shall enjoy with respect to it guaranties equally ample as if the same belonged to citizens of the United States."

█ Our Supreme Court has repeatedly held that such treaty has the force of law in Texas. See State v. Gallardo, 106 Tex. 274, 166 S.W. 369. Moreover, the State of Texas, by act of February 10, 1852, expressly relinquished all right in the Llano Grande Grant and necessarily Llano Grande Lake by such act. See 3 Gammel's Laws 941. It is our view that the State of Texas owned no rights in the Llano Grande Grant prior to the passage of the act of 1852, but if it did it certainly relinquished them by the express terms of the act.

The trial court in his amended findings of fact found: "1. Llano Grande Lake is a natural lake. It has been used for small pleasure boats, but it has never been used for the transportation of goods or people. Llano Grande Lake is not so situated as to be useful as a highway for commerce and it has never been so used, its north bank being sparsely populated

and its south bank being devoid of population."

█ Under the record, it is our view that Llano Grande Lake is not a public body of water, and that by reason thereof Arts. 4444, Vernon's Ann.Civ.Stats. and Art. 698b, Vernon's Ann.Penal Code, are not applicable to the factual situation here presented. This being our view, the court was not warranted in granting a permanent injunction against the City of Weslaco and his action in so doing must be reversed and remanded and the injunction dissolved.

In the event we are mistaken in this view, then in such event it is our opinion that plaintiffs have not carried their burden.

Art. 4444, supra, provides in part: "The State Board of Health shall enforce the provisions of this article. The Governor shall appoint an inspector to act under the direction of said board and the State Health Officer, and said inspector shall make such investigations, inspection and reports and perform such other duties in respect to the enforcement hereof as the said health officer may require."

█ The above provision of said article was contained in the original statute enacted in 1913, and the legislature in its wisdom has not seen fit to change it. The legislative action investing the enforcement of such article in the State Board of Health is consistent with (and not in conflict with) the common law rule to the effect that "no one may constitute himself a guardian of the public to maintain an action for nuisance which does not inflict on him an injury different to that sustained by the public generally." 31 Tex. Jur. 451–2. See also City of San Antonio v. Strumburg, 70 Tex. 366, 7 S.W. 754. It is obvious that Art. 4444, supra, by its own terms and under the decisions of our court applies to public waters and not private waters. Turner v. Big Lake Oil Co., 128 Tex. 155, 96 S.W.2d 221, points 1, 2 and 3. Under this record, our view is that Llano Grande Lake and the floodway are in contemplation of law private waters, privately owned, and therefore not

subject to the provisions of Art. 4444, supra, and Art. 698b, supra.

█ But if we are mistaken in such view and if Llano Grande Lake is a public body of water and by reason thereof Arts. 4444, and 698b, supra, become applicable, then we think the factual situation here presented is such as to require that the State Board of Health, acting through its proper representatives, be made a party.

At the request of the City of Weslaco the court made the following finding: "3. At the present time, the canning wastes of the City of Weslaco are treated by screening out the solids insofar as is possible segregation of the concentrated citrus juices and such dilution as is contained in the drainage ditch of Hidalgo and Cameron County Water Control and Improvement Dist. No. 9, into which said waste is emptied. Fish are found in the lake at all times of the year, and including the period of the canning season, generally from the month of November through the following May, and commercial fishermen are engaged successfully in the fishing in the waters of said lake throughout the year, including canning season. The waters of said lake are used both for the watering of cattle and for irrigation purposes, both east and west of the point where the Weslaco effluent empties into said lake."

Assuming, for the sake of argument, that the lake is a public body of water, it occurs to us that the wisdom of the legislature, in placing enforcement of Art. 4444, supra, in the State Board of Health, is particularly obvious under the record here presented. Here we have the cities of Mission, McAllen, Pharr, San Juan, Alamo, Donna and Weslaco, each a thriving community and each containing several thousand people, McAllen being the largest and having a population of approximately 21,000, using this floodway for a drainage area (carrying their sewage and effluent) into the lake, which acts as a settling basin. It is without dispute that the City of Donna was putting all of its raw and untreated sewage into Llano Grande Lake, and the City of San Juan was putting practically raw domestic sewage into the lake, and these cities were dismissed at the request of plaintiffs. The record also shows that there are 122 separate drains into the floodway, but that only one, under the court's findings and decree, is causing the pollution of the lake. See Tucker Oil Co. v. Matthews, Tex.Civ. App., 119 S.W.2d 606; City of Austin v. Howard, Tex.Civ.App., 158 S.W.2d 556, 561, writ ref. w. m.; Paluxy Asphalt Co. v. Helton, Tex.Civ.App., 144 S.W.2d 453, writ dis. c. j.; Gulf, C. & S. F. Ry. Co. v. Seydler, Tex.Civ.App., 132 S.W.2d 453, 455. If the lake is a public body of water, the State owns the fish in the lake, under Art. 4026, Vernon's Ann.Civ.Stats., and it would be interested in the protection of same, and has the legal duty to do so. Of course, the State is always interested in the public welfare of its citizens and necessarily the public health, and if the lake is a public body of water the State Board of Health has a positive duty to perform in order to see that such body of water is not polluted within the contemplation of the statutes so governing. Plaintiffs contend that the case of Goldsmith & Powell v. State, Tex.Civ.App., 159 S.W.2d 534 (writ ref.1942) is controlling here. We are not in accord with this view because the suit in the foregoing case was brought by the Attorney General in behalf of the State to prevent the pollution of waters of the Neches River and the question was not presented that the waters were private as distinguished from public. The provision of Art. 4444, supra, which provides in effect that the prevention of pollution of public waters of our state shall be vested in the State Board of Health is clear, positive and specific, and we think that it should be given effect. We think the State Board of Health is a necessary party in any cause of action in determining whether such lake, if it is a public body of water, is being polluted in violation of the provisions of our statute. Absent such view of the statute, the public policy of our state on such matters could be thwarted, without the state having had an opportunity to have its side of the controversy presented in a court of

justice. In the case of Texas Gulf Sulphur Co. v. State, Tex.Civ.App., 16 S.W.2d 408, the opinion shows that the injunction was issued on the application of the state, and that such application was grounded on violation of Art. 4444, supra, and the other statutory provisions therein discussed.

 Nor are we in accord with the trial court's conclusion of law to the effect that the plaintiffs "are entitled to maintain this action to abate a public nuisance affecting the waters of Llano Grande Lake, in the public interest, * *." See 31 Tex.Jur. 450–52 incl. The seven plaintiffs here built their homes in the vicinity of the lake with knowledge of the facts and conditions existing as to the uses being made of the floodway and lake for drainage purposes as well as the use being made of same for sewage and effluent. The record shows that the waters of the lake have never been used for drinking purposes; the water is still used for the purpose of irrigation and livestock, and it is still used for commercial fishing; and plaintiffs' damage is the inconvenience and discomfort they suffer by reason of the obnoxious odors that arise from the lake occasioned by the drainage of sewage and effluent of the canning industries into the lake. The permanent injunction awarded by the trial court vitally affects the canning industry (a substantial investment) in that immediate locality and approximately 1800 people of the City of Weslaco who labor in that one industry alone. It is also obvious from the court's findings on the whole, as well as the entire record in this cause, that a permanent injunction vitally affects the economy of the entire community of Weslaco, and greatly to the detriment thereof, so we find that the court's conclusion of law in this behalf is without any foundation of fact. We recognize that plaintiffs have a right to abate a common law nuisance insofar as it affects them, and that the equitable doctrines as announced by our Supreme Court in Storey v. Central Hide & Rendering Co., Tex.Sup., 226 S.W.2d 615, apply. See also opinion of this court in City of Corsicana v. King, Tex.Civ.App., 3 S.W.2d 857 (writ ref.1928); and authorities there cited; also Sun Oil Co. v. Robicheaux, Tex.Com.App., 23 S.W.2d 713, points 2–4.

 We think it follows from what we have said that the trial court did not err in refusing to grant plaintiffs' application for injunction against the other defendant cities herein named, and in this respect the judgment of the trial court is affirmed. Since the trial court rendered a "take nothing" judgment against these defendants, it is our view that the ends of justice will be better subserved if the judgment in this respect is reversed and remanded and the parties are given an opportunity to try the cause under the rule announced by our Supreme Court in the cases last above cited. See also Buchanan v. Jean, 141 Tex. 401, 172 S.W.2d 688, point 4.

Accordingly, the judgment of the trial court is reversed and remanded and the injunction granted is in all things dissolved. See Galveston, H. & S. A. Ry. Co. v. DeGroff, 102 Tex. 433, 118 S.W. 134, 21 L.R.A.,N.S., 749; Chandler v. City of Olney, 126 Tex. 230, 87 S.W.2d 250, points 3–4. The judgment of the trial court denying the injunction against the other defendant cities is in all things affirmed; but since the trial court entered a "take nothing" judgment against said defendants, the judgment in that respect is reversed and remanded.