**NASH & WINDFOHR et al. v. EDENS.**

No. 13595.

Court of Civil Appeals of Texas. Fort Worth.

Sept. 24, 1937.

Rehearing Denied Nov. 5, 1937.

R. F. Windfohr, Nash & Windfohr Oil Corporation, and Nash & Windfohr, a partnership composed of R. F. Windfohr and James P. Nash, the defendants, and alleged that all of the defendants were in possession of and had the management of and maintained and were the owners (together with certain other nonresident parties who were not made defendants) of a certain oil well known as the Nash & Windfohr et al. No. 1 McCloud in Young county.

Appellee seeks to recover damages against the named defendants, on the theory that salt water produced from the defendants' said oil well was permitted by the defendants to run into Farmers branch, a tributary of Salt creek, and then into Salt creek, which runs by appellee's farm lands, and that appellee, having for many years used such waters for irrigation purposes, received great damage from the use of such water, including the loss of several thousand strawberry plants.

Appellee further alleged that the salt water seeped back into the soil on his lands and killed a number of valuable pecan trees.

The transcript discloses that an answer was filed by R. F. Windfohr and the above-named partnership, composed of R. F. Windfohr and James P. Nash. Many special exceptions were urged against the plaintiff's pleadings, all of which were overruled.

The cause was submitted to a jury in the form of special issues, to which many exceptions and objections were made and overruled. The substance of such issues and the findings made by the jurors are as follows:

Issue No. 1 inquired whether or not the defendants "permitted salt water from their Ware lease" to flow into Farmers branch or Salt creek, within a period of two years prior to April 20, 1936. The jury answered, yes.

Issue No. 2 requested the jury to find whether or not the defendants in permitting the salt water to thus flow were guilty of negligence. The jury answered, yes.

Issue No. 3 requested the jury to find whether or not, since April 20, 1934, any pecan trees on the plaintiff's land had died. The jury answered, yes.

Issue No. 4 requested the jury to find whether or not the negligence, if any, of the defendants referred to in issue No. 2 was a proximate cause of the death

Marshall & King and Fred T. Arnold, all of Graham, for appellants.

C. Wesley Johnson, Jr., and S. P. Boling, both of Graham, for appellee.

BROWN, Justice.

Appellee, Joe Edens, brought suit in the district court of Young county, making

of the pecan trees. The jury answered, yes.

Issue No. 5 requested the jury to find the reasonable value of such pecan trees. The jury answered, $900.

Issue No. 6 asked the jury to find whether or not, since April 20, 1934, any of plaintiff's strawberry plants had died. The jury answered, yes.

Issue No. 7 inquired of the jury whether or not the defendants' negligence, if any, referred to in special issue No. 2, was a proximate cause of the death of the strawberry plants. The jury answered, yes.

Issue No. 8 inquired as to the reasonable value of the strawberry plants. The jury answered, $150.

On this verdict and the further finding of the jury that appeleee was not guilty of contributory negligence in using the water* for irrigation purposes, the trial court rendered judgment for appellee against the Nash & Windfohr Oil Corporation, R. F. Windfohr, and the partnership of Nash & Windfohr, composed of James P. Nash and R. F. Windfohr, in the sum of $1,050.

All of the defendants against whom such judgment was rendered have appealed.

■ No effort was made by appellee, either through his pleadings or his proof, to establish the fact that the appellants had polluted "public waters," such as are defined by article 7467, Rev.Civ.Statutes, the · pollution of which is expressly prohibited by article 698a, Vernon's Annotated Penal Code. Therefore, we must assume that the waters in question do not come within the purview of these statutes, and thus the case is reduced to one where specific negligence on the part of the appellants must be both pleaded and proved in order for a recovery against them to be had. This has been definitely determined by the Supreme Court of our state in the case of Turner et al. v. Big Lake Oil Co. et al., 96 S.W.(2d) 221, in an exhaustive opinion by Chief Justice Cureton. Weighed in the light of such authority, we must reverse the judgment of this case.

■ We do not believe that the allegations of appellee's petition are sufficient to state a specific act of negligence, and the exception to same, because it does not do so, is well taken.

We quote from appellee's allegations as follows:

"That defendants have maintained a series of dams for the storage of salt water on land belonging to John Ware on the North side of said railroad track on the headwaters of Farmers Branch. That when these reservoirs are full of said salt water defendants open the gates of said tank or cut the dikes at their will or have allowed the rains to break the said dikes, and have made no effort to prevent said salt water from coming down Farmers Branch and polluting Farmers Branch and Salt Creek. That the defendants are continuing to handle this salt water in this manner in utter disregard to the rights of plaintiff, and the handling of said salt water in this manner is a nuisance. That Farmers Branch flows into Salt Creek at a point directly opposite plaintiff's lands through land belonging to Blanch Johnson, Alline J. Ramsey and C. W. Johnson, Jr. That the defendants are continuing to allow salt water to come down in such strength from said McCloud well and the storage reservoirs on the McCloud lease and the Ware lease that it will kill pecan trees and when pumped onto plaintiff's vegetables and crops and fruit trees and pecan trees it will kill same. That the defendants are continuing to let said water come down into said Farmers Branch and Salt Creek in such volume that unless defendants are prevented from so doing it will kill all of plaintiff's trees. That by allowing said salt water to come into Salt Creek said salt water naturally seeps back into the land belonging to plaintiff, carrying with it this large salt content from said McCloud well. That unless defendants are prevented from allowing said salt water to come into Salt Creek as aforesaid it will eventually kill all of plaintiff's pecan trees. That plaintiff has a grove and orchard of native and improved pecan trees of the reasonable value, together with the land thereon, in the sum of Ten Thousand Dollars, and defendants are threatening and will continue to allow said salt water to come down, and unless prevented said pollution of Salt Creek will make plaintiff's land totally valueless. That plaintiff has no other means of making a living other than from the above described land and the trees and the crops thereon. That the defendants since bringing in of said well have allowed the salt water, together with surplus quantities of oil at different times to flow into Farmers Branch and from there into Salt Creek without making any real effort to prevent said

salt water from flowing into said Salt Creek but on the contrary have maintained and are maintaining large reservoirs and earthen tanks as above stated for the storage of said salt water and have upon the occasion of every rain and at divers other times have opened the gates of said tanks and surface reservoirs or cut said dams or said storage tanks and basins and allowed the salt water to come down into Salt Creek, and that the defendants are still allowing said salt water to escape from their wells and surface tanks and storage basins and reservoirs and at their own pleasure and whenever they desire, without regard to plaintiff's rights, and defendants are threatening to continue the same to plaintiff's damages as will be hereinafter set out.

"That for the two years immediately preceding the filing of this petition the defendants have continued to allow said salt water and brine to escape from their McCloud well and from their pits, surface reservoirs and tanks and to come down Salt Creek. That the foregoing acts of defendants are nuisances and is negligence on the part of defendants and defendants by the use of reasonable diligence knew or should have known that the foregoing acts of defendants in allowing their salt water to pollute Salt Creek was negligence and said defendants did pollute Salt Creek with salt water as above set forth, and said acts on the part of defendants was negligence and was the proximate cause of the damage to the plaintiff, as hereinafter described."

■ Appellee, while on the witness stand, testified as follows:

"Q. Have you followed the course of Farmers Branch to see where that salt water comes from? A. Yes, sir.

"Q. Where does it come from? A. McCloud, Hinson and Ware leases.

"Q. Who owns those leases? A. Nash & Windfohr.

"Q. Now, with reference to the Graham-Loving road and the Graham-Farmer road, where is the Ware lease, the defendants' Ware lease? A. It comes down like that, that's the Ware lease, in between the two roads.

"Q. With reference to the corner where are the defendants' dams? A. They have two dams in the corner on the Ware and the back of the Ware is higher than it

is in here; these are filled up after each turning, and this water is allowed to stand for days until the dam gets full and breaks over, and the team goes there and fixes these dams back.

"Q. Before Nash & Windfohr drilled those wells in there was there any evidence of natural salt outcroppings? A. No, sir.

"Q. No natural salt springs? A. No, sir.

"Q. How does this water get to the Ware lease? A. It comes under the railroad from the Hinson down the branch into the corner of the Ware, where these two little dams are built up, every week or two, and from the McCloud it comes under the railroad through a six inch line and goes into a pit on the Ware, and it soaks out and spills over the top and gets in Farmers Branch—its running in it today.

"Q. Where is that water going—where is it coming from now? A. Its coming from the McCloud mostly now; the dams are not quite full on the Hinson; the water is coming from the McCloud to the Ware, and some of it is coming out of the Ware wells.

"Q. Do the defendants own the leases and operate them? A. Yes, sir.

"Q. Outside the defendants' leases on the Ware and the McCloud and the Hinson, are there any other oil wells or salt water on the drainage of Farmers Branch? A. No, sir."

In our opinion this testimony does not establish ownership or control definitely, but leaves the court and jury to speculate as to such issues. When appellee was asked who owned the leases in question, he simply replied, Nash & Windfohr. Such an answer neither attempts to designate nor describe either the partnership or the corporation. No effort was made to have the jury ascertain such ownership, and on the verdict the court has assumed that the ownership is in the corporation, the partnership, and the named individuals, just as was pleaded by appellee.

■ Furthermore, we do not find any evidence or testimony in the record sufficient to establish any issue of negligence on the part of any of the defendants. For aught the record discloses, if there were any salt waters flowing in the designated streams at any time testified to by appellee, none of the defendants was responsible

for such condition. Furthermore, we desire to say that we do not believe the evidence introduced for the purpose of establishing the fact that salt water in this creek seeped through the soil and soaked into appellee's lands and killed his pecan trees is sufficient to raise such an issue. No effort was made to show that the salt water overflowed the banks of the stream and covered the soil over the roots of these trees. And no effort was made to show the salt content in the water at any time, and we are of opinion that under such circumstances a mere layman, such as is appellee, cannot give, as his opinion, a statement that salty water flowing along or standing in a stream actually soaks into the soil for a distance of from 10 to 40 feet in sufficient quantities to kill a pecan tree, and thereby raise an issue of fact as to the death of such pecan trees from the salt water. Furthermore, if it be shown by any reasonable testimony that the salt water, acting in such manner, killed appellee's pecan trees, some of which he testified were from 200 to 300 years old, then it is apparent that all of the vegetation in, around, and near the tract of land on which the pecan trees stood must of necessity have been killed, and, if this be true, there has been a total destruction of a certain portion of appellee's land and his measure of damages would undoubtedly be the difference between the reasonable market value of the same before the injury and that immediately after.

■ We are of opinion that the wrong measure of damages was applied in connection with the alleged loss of appellee's strawberry plants.

There is nothing in the record tending to show that a strawberry plant has an existence like unto a fruit tree, or a pecan tree.

In our opinion, if appellee suffered any loss because of damage done to his strawberry plants, his measure of damages would be the net market value of the crop he would, in all reasonable probability, have made, unless the evidence discloses that strawberry plants ordinarily have an existence extending beyond the year same are planted.

In the light of the record before us, we are of the opinion that the judgment of the trial court should be reversed and the cause remanded, and it is so ordered.

## On Motion for Rehearing.

■ We find that article 698a of Vernon's Annotated Penal Code, enacted to prevent pollution of "any stream, water course or natural body of water of this State," in dealing with the discharge of salt water into streams from which waters are taken for irrigation purposes, specifically prescribes the salt content that renders the water unfit for use, and thereby fixes the salt content that is not harmful to the waters.

The act provides: "All discharges of salt water contributing to conditions inhibited by this Act or cumulative of conditions inhibited by this Act shall be violations of this Act; providing that any and all discharges of salt water into a fresh water stream or other natural body of fresh water of this State, that produces or contributes to a salinity in excess of two thousand [2000] parts of salt in one million [1,000,000] parts of water shall be violations of this Act."

This act is dealing with fresh waters that may be used for watering livestock, or for domestic or irrigation purposes.

We have no right to assume that the figures used by the lawmakers of this state, which fix the salt content at a certain density before fresh waters are rendered unfit for the above-mentioned purposes, are arbitrary figures.

On the other hand we are assuming that the lawmakers received expert, or scientific information covering such matters before they used and adopted the figures quoted above.

Whether the stream involved in this suit comes within the antipollution statute, or not, is immaterial.

It necessarily follows that the same salt content makes waters unfit for irrigation in streams that are private as well as those that are public.

■ No effort was made to establish the salt content of the waters in this case and we cannot hold that water is unfit for irrigation, or for use by livestock, merely because the testimony is that it is salty.

Furthermore, we decline to hold that salt water can seep through the banks of a stream for several feet and kill large native trees, without any testimony showing the salt content of the waters.

The motion for rehearing is overruled.