GARLAND GRAIN COMPANY et al.,
Appellants,

v.

D-C HOME OWNERS IMPROVEMENT
ASSOCIATION et al., Appellees.

No. 146.

Court of Civil Appeals of Texas.

Tyler.

June 24, 1965.

Rehearing Denied Sept. 16, 1965.

Frank J. Scurlock, Turner, Rodgers, Winn, Scurlock & Terry, Dallas, for appellants.

James E. Coleman, Jr., and Hal M. Bateman, Carrington, Johnson & Stephens, Dallas, for appellees.

MOORE, Justice.

This is a suit for a mandatory injunction to abate a nuisance. The suit was brought by an association of home owners and land owners known as the D–C Home Owners Improvement Association, hereinafter referred to as plaintiffs, against Garland Grain Company, et al., hereinafter referred to as defendants. The alleged nuisance consists of feed lots operated by Garland

Grain Company where a large number of cattle is fed and fattened and ultimately sold at various meat packers throughout the state and elsewhere. The feed lots, owned by the defendants, are located on an 86-acre tract of land owned by the defendants in northeast Dallas County, about one-half mile south of the south boundary line of Collin County. The various lots, which are contiguous, cover an area of ten acres. The cattle are transported to the feed lots and placed in small pens where they are intensively fed with highly concentrated cattle feed for a period of approximately 90–120 days and are then transported away for slaughter. The maximum capacity of the pens at any one time is 5,000 cattle. However, the maximum is maintained only during the months of September, October, November, December, January and February. During the remainder of the year, the amount is considerably reduced. On March 16, 1964, the day of the trial, there were only 800 cattle in the pens. As a result of the concentration of the cattle, it is admitted that at times there is as much as thirty tons of manure on the ground in the lots and that collected and stacked on the outside. It is undisputed that defendants were operating the feed lots according to the most modern methods and techniques and the evidence further shows that the feed lots were periodically inspected by the Health Department of Dallas County which approved the operation. Plaintiffs admit that the defendants were not negligent in any respect in the operation of the business. The plaintiffs allege that the feed lots constitute a nuisance because of the obnoxious odor, noise, flies and birds emanating from the lots which are such as to substantially interfere with the comfort and enjoyment of their property and homes. They further allege that as a result of the natural and normal drainage of defendants' land, the water of Rowlett Creek, which borders on three sides of the defendants' property, was polluted by foul, germ-carrying bacteria-laden manure, creating a public and private nuisance.

When the suit was originally filed there were seventy-nine plaintiffs. At the time of trial, because of withdrawal, non-suits, etc., there was a total of forty-one plaintiffs, twenty-eight of whom lived within the area and thirteen of whom were non-resident land owners. The total area of land owned by the forty-one plaintiffs embraces an area covering 2900 acres for an average of seventy-eight acres per plaintiff. On the average, their homes are three-quarters of a mile apart, the closest to the pens being one-fourth mile and the farthest being two and three-fourths miles. The area is described by some of the plaintiffs as being "farm and ranch country." It is located in the center of an area approximately five miles from the cities of Garland, Richardson, Plano and Wylie, but is not within or near the city limits of either city. There are no churches, schools or other public places within the immediate vicinity. Almost without exception the plaintiffs, their tenants and neighbors own a rather large number of cattle and other livestock and some of the homes have out-door toilets. Defendants established their business at its present location in November, 1960, at a time when the plaintiffs were then living in the area. In addition to the purchase of the land, defendants have invested a substantial sum of money in fences, barns, feed troughs, water wells, deep well, complete underground water system, electric system, feed mill, automotive equipment and a residence.

The trial was to a jury on Special Issues, in which the jury found that:

(1) The odors from defendants' cattle feeder pens came over and across the plaintiffs' land;

(1a) That such odors would continue to come over and across the plaintiffs' land in the future;

(1b) That such odors constitute a nuisance;

(2) That the feeder pens were not a breeding place for flies;

(2a) And would not, therefore, continue in the future;

(2b) And that did not, therefore, constitute a nuisance;

(3) That the feeder pens attracted birds;

(3a) That such will necessarily continue to recur in the future;

(3b) That it was not a nuisance because it attracted birds;

(4) That the feeder pens created noises;

(4a) Which would continue in the future;

(4b) That the noises did not constitute a nuisance;

(5) That the feeder pens cause pollution of the water of Rowlett Creek "as the same flows past defendants' property;"

(5a) That such pollution of the water of the creek will continue to recur in the future;

(5b) That such pollution does not constitute a nuisance.

The trial court rendered judgment for the plaintiffs, permanently and perpetually enjoining the defendants from continuing, maintaining, or failing promptly to abate the operation of the cattle feeding business being conducted by them.

Garland Grain Company, together with the other defendants, appealed from the judgment contending first that the trial court was in error in requiring them to discontinue their business because the undisputed evidence shows that such is a lawful, useful and necessary business contributing to the welfare and prosperity of the community and not constituting a hazard to health and therefore plaintiffs should be required to seek any relief which they have by way of a suit for damages, and secondly that under the circumstances, the trial court abused his discretion in balancing the equities in favor of the plaintiffs and holding that odor alone is a nuisance

per se requiring abatement as a matter of law.

■ The judgment does not indicate whether the injunction was granted because of the pollution of the creek or the cause of the creation of an obnoxious odor, or both. It merely granted plaintiffs' motion for a judgment on the verdict. Therefore, we must assume that the judgment is based upon both such findings.

■ If the judgment is based upon pollution of Rowlett Creek, we find ourselves in disagreement with the ruling of the trial court.

There seems to be no question that the water of Rowlett Creek was to some extent polluted. The question propounded to the jury inquired whether defendants caused the pollution, to which they answered affirmatively, and the question now presented is whether or not there is any evidence to support their finding on the question of causation. Dr. Sol Haberman and Dr. George Race, who were witnesses called by the plaintiff, testified that they each took samples of water from the creek at a point both above and below the defendants' feed lots and found that neither the upstream water nor the downstream water would be safe for human consumption or swimming. The upstream samples were taken on April 11th and 17th, 1962, at a bridge which crosses the creek about 150 yards above the cattle pens. Dr. Haberman examined both specimens and found one to contain 45,300 organisms per cc of water and the other to contain 25,000 organisms per cc of water. One of the downstream samples was taken by Dr. Race on April 11th and was taken at a point where Brand Road crosses the creek approximately one mile below the defendants' feeder pens. On April 17th Dr. Haberman also took a downstream sample on the property of Dr. Evans which lies between the bridge and defendants' property. At the point where he took his downstream sample, Dr. Evans pastures ninety head of cattle which have free ac-

cess to the creek. Dr. Haberman testified that the downstream sample taken at the bridge by Dr. Race contained 91,000 organisms per cc of water and that the one which he took on the property of Dr. Evans contained 122,600 organisms per cc of water. He testified that the water at either of the points below the pens would not be safe for human consumption or swimming. On the question of whether or not the pollution could cause any disease to cattle, Dr. Race testified: "I think it is debatable as to risks. * * * I mean, there are so many factors, I don't believe I could answer that."

The evidence shows that the defendants' feed pens are located in the extreme northeast corner of their 86-acre tract of land. Rowlett Creek, as it flows down from the north, comes within approximately 175 yards of the feed pens, and then turns west and flows approximately one-fourth of a mile, then turning south for another one-fourth of a mile and then east approximately one-half mile and this surrounds the entire tract except on the east side thereof. Defendants have erected a six-foot levee west of the pens which extends across the entire tract running from north to south, thus preventing drainage toward the creek on the west. The natural drainage of the defendants' land is to the south. This area is a meadow containing approximately fifty acres covered with grass and gradually sloping toward the creek. The distance across the meadow from the pens to the creek is approximately one-fourth of a mile.

■ Although the jury found that the feeder pens caused pollution of the creek, in our search of the voluminous record, we have been unable to find any direct evidence showing that the defendants either negligently or intentionally deposited any of the fecal matter from the cattle into the stream or that they ever, at any time, allowed any of the cattle to leave the pens or go near Rowlett Creek. No attempt was made to trace any of the fecal matter from the pens to the stream. While we might speculate

that as a result of a heavy rain, manure and other fecal matter would naturally drain off the defendants' property and in the direction of the creek, there is no showing that the samples taken by Dr. Race or Dr. Haberman were taken immediately after a rain or overflow and there is no showing that the matter drained directly into the creek. Thus, we are left to speculate as to whether or not at the time the samples were taken any of the fecal matter from defendants' pens actually polluted the creek or whether the pollution was caused exclusively by the cattle of the adjoining land owners whose cattle used the creek. Since it is undisputed that the stream was polluted above defendants' pens and it is undisputed that at least ninety head of cattle have access to the stream immediately below where the water was likewise polluted, plaintiffs would have the burden of showing that the defendants also were depositing or causing to be deposited harmful material into the water and thus contributing to the further pollution of the stream. We have been unable to find any evidence showing that any matter from defendants' pens ever reached the creek nor have we been able to find any evidence showing that if it did that the substance from the defendants' pens was the cause of the type of pollution which was found to be present. As in all other suits, the plaintiff in an injunction suit has the burden of proving not only the wrongful conduct, but also that the injury complained of was proximately caused by such wrongful conduct. Nash & Windfohr v. Edens, 109 S.W.2d 496 (Tex. Civ.App.); Killam v. Moerbe, 131 S.W. 2d 143 (Tex.Civ.App.).

■ Assuming, however, that we be mistaken in this conclusion and that there is some evidence showing that defendants caused the pollution, we are of the opinion, nevertheless, that plaintiffs are not entitled to an injunction solely on the ground that the pollution of the creek is a public nuisance as they contend. The state is not a party to this suit. Even though the pollution of a public stream is made unlawful

by the provisions of Article 7621d, Vernon's Ann.Tex.Civ.St., the duty of prohibiting pollution of public waters is vested exclusively in the state. Though a nuisance may be public, it furnishes an individual no right of action, unless he has in some way been actually injured or will suffer such an injury by its maintenance. No one can constitute himself a guardian of the public and maintain an action for public nuisance which does not sensibly injure him or his property, although he be a member of the community where such nuisance exists. The rights of the general public are not involved unless the state—the custodian of those rights—is made a party to the suit. Absent such view of the statute, the public policy of our state on such vital matters could be thwarted, without the state having had an opportunity to have its side of the controversy presented in a court of justice. Boyd v. Schreiner, 116 S.W. 100 (Tex.Civ. App.); City of Weslaco v. Turner, 237 S.W.2d 635 (Tex.Civ.App.); 31 T.J.S., par. 130, page 247.

■ Nevertheless, we recognize that the plaintiffs have a right to abate a common law nuisance insofar as it affects them. City of Weslaco v. Turner, supra.

As we view the question of pollution, plaintiffs' suit is merely an action to abate a private nuisance calling for a determination the right of riparian owners.

■ The basic principles of the common law doctrine of riparian rights have been retained in this state. That is, every riparian owner is entitled to make reasonable use of the water as it flows by his land, subject to similar rights of other riparian owners. Whether the legal right of one riparian has been invaded by another by the impairment of the quality of the water is a question of fact depending upon whether such use is reasonable. Boyd v. Schreiner, supra; 60 T.J.S., par. 65, p. 384.

■ It is laid down in general terms that every owner has the right to enjoy the stream of water which flows through his land in its natural state, without diminution to its flow, quantity or purity. It is also held with like generality of statement that any defilement or corruption of the water which prevents its use for any of its reasonable or proper purposes is an infringement of the right of riparian owners which will entitle them to a remedy suited to the nature of the case.

"But all abstract rules are subject to considerable modification when they are applied to the exigencies of human life. The right to the use of a stream of water in its natural purity cannot override other co-equal and co-existing rights; it must certainly yield to those of a more absolute and unqualified character. The tillage of the soil and the tending of flocks and herds were the earliest occupations of the human race. The husbandman soweth his seed and gathereth the harvest to furnish us with food; and the flocks and herds bring forth their increase for our use. It would be most unnatural and unwise to put any unnecessary restrictions on those pursuits which furnish the world with the means of subsistence. We must confess that the right of a man to cultivate his own fields, and to pasture his cattle on his own land, is of an original and primary character, and that it would be oppressive to interfere with the free exercise of it, except under a necessity caused by grave public considerations. The washings from cultivated fields might, and probably would, carry soil and manure into streams of water, and make them muddy and impure. And so the habits of cattle according to their natural instincts would lead them to stand in the water and befoul the stream. But, nevertheless, the owners of the land must not lose the beneficial use of it. The inconveniences which arise from the pollution of the water by these causes must be borne by those who suffer from them. The ordinary require-

ments of domestic life diminish the purity of the atmosphere; but as long as these causes are within the limits of reason and necessity the law recognizes no ground of complaint against them. The reasonable and proper exercise of acknowledged right by one man may, and often does, work annoyance and loss to another; but rights cannot be forfeited for this reason." Helfrich v. Catonsville Water Co., 74 Md. 269, 22 A. 72, 13 L.R.A. 117; 93 C.J.S. Waters § 49, page 694.

Even though the jury found that defendants caused pollution, they further found such pollution did not constitute a nuisance. In order to determine the meaning of the jury's finding of no nuisance, we must turn to the definition of the term as defined by the court. When we come applying the jury's findings to the definition of "nuisance," it is obvious that the jury meant to say that defendants did not bring about or create a condition in the use of its property such that it necessarily caused inconvenience, injury or harm to plaintiffs in the use and enjoyment of their property, substantially, materially and unreasonably interfering with the plaintiffs' comfort and proper use and enjoyment of their property, taking into consideration the nature and use of the property of both parties and the nature of the location in which they were situated.

Thus, even though the jury found that plaintiffs caused a pollution of the creek, they further found that under the circumstances, their contribution to the already polluted water was not an unreasonable use of the water as a riparian owner, and therefore plaintiffs were not damaged or injured thereby.

Plaintiffs insist, however, that regardless of whether they are entitled to an injunction because of pollution the judgment of the trial court should, nevertheless, be affirmed because the evidence supports the finding that the disagreeable odor constituted a nuisance and further supports the find-

ing that the equities are balanced in favor of the plaintiffs and that the issuance of a permanent injunction was, therefore, proper. Defendants contend that since no question of health is involved, but only odor, the trial court abused his discretion in balancing the equities in favor of the plaintiffs and decreeing that their useful, necessary and lawful business be destroyed merely because it created a disagreeable odor.

In Storey v. Central Hide & Rendering Co., 148 Tex. 509, 226 S.W.2d 615, affirming the Court of Civil Appeals in 223 S.W. 2d 81, the Supreme Court held that the abatement of a lawful place of business was a harsh remedy. The court further held that there should be a balancing of the equities in order to determine if an injunction should be granted. City of San Antonio v. Camp Warnecke, 267 S.W.2d 468 (Tex.Civ. App.).

The balancing of equities is one to be determined by the chancellor in accordance with established equitable rules and principles, and will be disturbed only on a showing of abuse of discretion. Hill v. Villarreal, 383 S.W.2d 463 (Tex.Civ.App.); Texas Lime Company v. Hindman, 300 S. W.2d 112 (Tex.Civ.App.), aff. 157 Tex. 592, 305 S.W.2d 947.

The issue presented involves the conflicting rights of the parties in the respective uses of their properties. The question is whether the nuisance should be abated or whether the plaintiff relegated to suits for damages.

The evidence shows that the defendants originally purchased the land and commenced to operate in November, 1960, and have made a total investment of $166,000.00 and would, no doubt, suffer a substantial financial loss if forced to move or discontinue the business. During the first three years of operation, 22,361 head of cattle was brought into the lots, most of which were from the eastern part of Texas, having a value of $1,833,602.00 and having a value of $3,130,540.00 at the time they were taken

out; feed stuff purchased amounted to $859,421.48 of which the sum of $72,310.00 was purchased within a radius of twenty miles. Plaintiffs continuously employ five to six men, as well as part-time employment of veterinarians and other independent contractors. It is conceded that defendants operate the business by the most modern and up-to-date methods, including the use of modern chemicals to prevent odors, and that there is no negligence. Most of the cattle are sent to various packing houses in the northeast section of the state where they are processed and the meat and other by-products are sold and distributed within the area. It is undisputed that there is no place in Dallas, Tarrant, Collin, Rockwall, Ellis and Kaufman counties where such feed lots could be located where they would not be subject to the same objection by people residing in similar areas.

It is undisputed that most of the plaintiffs own livestock, maintain barns and out-houses and that cattle manure may be found on the ground throughout the area. It was shown that the operation of the feeder pens performs a service for the welfare of the general public and that it is the only operation of this sort in this section of the state and that the business is particularly adaptable to this section of the state because of the available supply of cattle and feed supplies, as well as a ready market for the sale of fresh meat.

" 'According to the doctrine of "comparative injury" or "balancing of equities" the court will consider the injury which may result to the defendant and the public by granting the injunction as well as the injury to be sustained by the complainant if the writ be denied. If the court finds that the injury to the complainant is slight in comparison to the injury caused the defendant and the public by enjoining the nuisance, relief will ordinarily be refused. It has been pointed out that the cases in which a nuisance is permitted to exist under this doctrine are based on the stern rule of necessity rather than on the right

of the author of the nuisance to work a hurt, or injury to his neighbor. The necessity of others may compel the injured party to seek relief by way of an action at law for damages rather than by a suit in equity to abate the nuisance.

" 'Some one must suffer these inconveniences rather than that the public interest should suffer. * * * These conflicting interests call for a solution of the question by the application of the broad principles of right and justice, leaving the individual to his remedy by compensation and maintaining the public interests intact; this works hardships on the individual, but they are incident to civilization with its physical developments, demanding more and more the means of rapid transportation of persons and property.'

"On the other hand, an injunction may issue where the injury to the opposing party and the public is slight or disproportionate to the injury suffered by the complainant.

"Some decisions ignore the balance of injury doctrine as above stated. They seemingly authorize the grant of an injunction as a matter of right where the facts present a clear case of nuisance. But these cases do not represent the weight of authority." Storey v. Central Hide & Rendering Co., supra; Fargason v. Economy Furniture, Inc., 356 S.W.2d 212 (Tex.Civ.App.); Georg v. Animal Defense League, 231 S.W.2d 807 (Tex.Civ.App.).

What was said in Galveston, H. & S. A. Ry. Co. v. De Groff, 102 Tex. 433, 118 S. W. 134, 21 L.R.A.,N.S., 749, would seem to be especially applicable here.

" * * * Some one must suffer these inconveniences rather than that the public interest should suffer. If the defendant were compelled to remove to another part of the city, the same nuisance to other people would be caused by the same necessary opera-

tion of the machinery, and the citizens at that point could with greater propriety than plaintiffs seek another injunction. These conflicting interests call for a solution of the question by the application of the broad principles of right and justice, leaving the individual to his remedy by compensation and maintaining the public interests intact. This works hardships upon the individual, but they are incident to civilization with its physical developments, demanding more and more the means of rapid transportation of persons and property. The plaintiffs should be left to their action for damages. The injunction should not have been granted."

In view of the fact that the question of health is not involved and that defendants' business is located in a rural area where many of the plaintiffs' cattle, to some extent at least, causes obnoxious odor and in view of the fact that there is no other place in this area of the state where such lawful business could be maintained without visiting the same burden on other people and in view of the fact that the cessation of defendants' business would result in harm to the public as well as defendants, we have concluded that the trial court was in error in finding that the equities were balanced in favor of the plaintiffs. The odor is not shown to be constant, but varies with the direction of the wind. The circumstances in our opinion do not present a situation where defendants' use of their own property is so unreasonable as to deprive the plaintiffs of the use and enjoyment of their property to such a substantial and material degree as to warrant the granting of a permanent injunction. The fact that the area may at some future date be urbanized or that it is now included in the "Garland Urban Growth Plan" or is included in the plan known as the "Greater Dallas Metropolitan Community" is speculative and too remote for consideration at the present time. Boyd v. Schreiner, supra.

If plaintiffs' legal remedy is as complete and efficient as the equitable one then they must pursue their legal remedy. Humble Oil & Refining Co. v. Luckel, 154 S.W.2d 155 (Tex.Civ.App.), writ refused. It is apparent from this record that any damages suffered by appellees, either personal or to their property, is easily ascertainable. Quoting again from Galveston, H. & S. A. Ry. Co. v. De Groff, supra:

"* * * It is a well-established principle which is recognized in the petition that the plaintiffs were not entitled to an injunction in this case if they had an adequate remedy at law; that is, if they could recover by a suit at law for the amount of the depreciation of the real estate and compensation for the decrease in the business of hotel keeping. It does not require authority nor argument to show that the decrease in the value of the real estate could easily be ascertained and could be compensated for in money. * * *"

It is also stated in King v. Columbian Carbon Co., 5 Cir., 152 F.2d 636, 641:

"* * * The property of an individual may not be damaged for public use without just compensation, and assuredly it may not be damaged for private use without such compensation. As a concession to industrial progress and social utility the law will not abate a useful and lawful enterprise even though it be a nuisance, but further than that the law does not recede. It still requires payment for unwarranted, unreasonable, and substantial damage done to the property of another which is caused by the construction and operation, however skillful, of an industrial plant in a locality undevoted and unadapted thereto."

We have reached the conclusion that the plaintiffs are not entitled under the facts and circumstances of this case to a permanent injunction prohibiting the operation

of defendants' feed lots for the reason that they have an adequate legal remedy for damages.

The judgment of the trial court is reversed and the permanent injunction is dissolved and judgment is hereby rendered for the defendants.

Reversed and rendered.