**David HOLUBEC and Mary Holubec, Appellants,**

v.

**Carl BRANDENBURGER, Individually, and as Next Friend of Payton Brandenburger and Carson Brandenburger, Kathy Brandenburger, William R. Lee, Laverne Lee, and R & J Livestock Company and Batesville Farming Company, Appellees.**

No. 03–00–00684–CV.

Court of Appeals of Texas, Austin.

Aug. 30, 2001.

Rehearing Overruled Nov. 15, 2001.

Robyn Ashley Frohlin, Jackson Walker L.L.P., Austin, for appellants.

Richard T. Miller, San Saba, for appellees.

Before Justices YEAKEL, PATTERSON and POWERS.[*]

POWERS, Justice (Retired).

David and Mary Holubec (the "Holubecs") appeal from a judgment recovered on the jury's verdict by several plaintiffs whom we will refer to collectively as the "Brandenburgers."[1] We will affirm the judgment.

## THE CONTROVERSY

The Brandenburgers alleged against the Holubecs a nuisance action based upon conditions allegedly created by the Holubecs' feedlot adjacent to the Brandenburgers' home, namely: great deposits of manure, muddy hollows, rotting feed, and decaying animal bodies that gave rise to hordes of flies, clouds of manure-laden dust, mold spores, insecticides, and foul and obnoxious odors that invaded the Brandenburgers' property; bawling lambs confined in the feedlot for weaning; and, bright elevated lights that illuminated the Brandenburgers' home at night and prevented their sleeping. The jury found these conditions amounted to a nuisance and the Brandenburgers recovered judgment restraining the Holubecs from certain actions regarding the feedlot and requiring or permitting other matters.

To understand properly the Holubecs' appellate complaints, it is necessary that we summarize the body of evidence, the verdict, and the final judgment. The Holubecs and Brandenburgers share a common boundary. The Holubecs own three contiguous tracts of rural land totaling about 450 acres. Their feedlot lies against their western boundary and 135 feet from the Brandenburgers' home, which is situated just inside their eastern boundary. In addition to the 450 acres, the Holubecs own and lease other land in the vicinity amounting to about 4,500 acres. On their various properties, they ordinarily have about 3,000 ewes year in and year out and realize annually almost as many lambs. These lambs, together with others acquired by the Holubecs, are confined in the feedlot for weaning.

Before they purchased the three tracts of land comprising the 450 acres, the Holubecs leased one of the tracts. They fed sheep in a fenced twenty-acre pasture on the leased tract. They purchased the tract subsequently and converted part of the twenty-acre pasture to a ten-acre feedlot consisting of iron-pipe pens, feed troughs,

---

[*] Before John E. Powers, Senior Justice, (retired), Third Court of Appeals, sitting by assignment. See Tex. Gov't Code Ann. § 74.003(b) (West 1998).

[1] The plaintiffs in the trial court were William R. Lee, Laverne Lee, R & J Livestock Company, and Batesville Farming Company, owners of undivided interests in a large ranch; and their foreman Carl Brandenburger who lives in a dwelling on the ranch, joined by his wife Kathy Brandenburger and their infant children Payton and Carson Brandenburger who appear by their father as next friend.

and other small structures. According to David Holubec's testimony, he designed the feedlot to accommodate 6,000 lambs and, from time to time, as many as 5,800 head were confined therein. Another witness testified the facility would accommodate 10,000 head. According to the Holubecs' evidence, the feedlot improvements were completed in June 1997, at a cost of $75,284.19, and at the time of trial had a depreciated value of $40,284.19 for income-tax purposes. No evidence was adduced to show the cost of moving the pens and other structures to another location or whether the feedlot was a profitable operation. The feedlot is not the Holubecs' livelihood. They make their living from farming and from their fertilizer and seed businesses. Although David Holubec testified he built the ten-acre feedlot before the Brandenburger home was erected in 1993, he was shown to be mistaken by testimony of other witnesses, county tax records, and an aerial photograph published by the United States Department of Agriculture. These show the feedlot was not constructed until several years after the Brandenburger home was built and occupied.

The Brandenburgers introduced testimony as follows: the conditions amounting to a nuisance did not exist so long as the Holubecs confined and fed a number of sheep in the twenty-acre pasture from which the ten acres were carved to build the feedlot; the nuisance conditions began when thousands of lambs were confined in the newly constructed feedlot pens. It was then that manure began to accumulate in large quantities, lambs began dying in sizeable numbers, dead animals were placed in nearby "dead pits," two lagoons were dug to catch runoff from the pens, and watering the animals in the feedlot resulted in muddy bogs, all of which furnished breeding grounds for flies, caused foul odors, and during dry periods led to dust that invaded the Brandenburger residence along with the flies, odors, and loud noise of bawling lambs.

The Holubecs confine lambs in the feedlot for about a ninety-day period during which the lambs are weaned from mother's milk to feed. About two percent of the lambs, or some 120 animals, die in the feedlot during such periods. According to David Holubec's testimony, the feedlot is checked for dead bodies at least three times each day. The dead bodies are removed immediately on being discovered and are placed in the dead pits where they are covered with a layer of soil to prevent flies and discourage scavengers. Photographic evidence was introduced, however, showing that some of the dead bodies were not covered for weeks or months and were in a state of decay. David Holubec testified that when he dug the dead pits, he never thought about whether they would result in odors that might bother his neighbors.

David Holubec testified further as follows: the elevated lights of which the Brandenburgers complained were erected to enable him to observe the lambs in the feedlot in darkness, and to move the animals about in the night; his feedlot and dead pits do not breed flies or produce dust or foul odors, nor do they attract buzzards; the weaning lambs in the feedlot do not bawl; and the flies of which the Brandenburgers complain do not come from his feedlot because he took measures to prevent their breeding. This testimony was contradicted absolutely by other evidence, including testimony given by the Brandenburgers, photographs, and contrary answers to written interrogatories given by David Holubec himself before trial. The contradictory evidence included the testimony of an entomologist who inspected the dead pits, the lagoons, the feedlot, and other aspects of the feedlot

operation. In his opinion, the flies were bred in the dead pits and other specified locations in the feedlot. He was unable to find any condition on the Brandenburger property from which the flies might have come.

No evidence was adduced to show the Holubecs could not operate the feedlot elsewhere on their 450–acre tract or on another of their nearby properties where the operation would not bother a neighbor. David Holubec testified he was "not going to change the way" he operated the feedlot unless made to do so by the court; and he intends to keep the feedlot permanently where it is now. He admitted he never replied to inquiries from the Brandenburgers seeking to arrive at a mutually agreeable solution to the feedlot problem, and conceded he "ignored" the inquiries.

In response to Questions One and Ten, the jury found the feedlot was a permanent nuisance; in response to Question Three, the jury answered that the Holubecs had negligently constructed or operated the feedlot; in answer to Question Four, the jury failed to find any sum of money that would fairly and reasonably compensate the Brandenburgers for damages caused them by the nuisance or negligence, considering the elements of personal discomfort, annoyance, inconvenience, sickness, medical care, physical pain, and mental anguish; and, in answer to Questions Five and Six, the jury found the nuisance or negligence proximately caused a $12,932.50 reduction in the market value of the Brandenburger property. In response to Question Nine, the jury found the Holubecs had obstructed the normal flow of air to the Brandenburger land.

The trial court rendered judgment as follows:

On or before September 10, 2000, the Holubecs must desist and refrain from the following acts:

1. Operating a sheep feedlot or stabling, confining, feeding or maintaining on the [450 acres] any animals in confinement areas that do not sustain such animals on the crops, vegetation, forage growth, or post harvest residues produced in such areas in the normal growing season;

2. Feeding hay or other feed within 1750 feet of the [Brandenburgers'] residence;

3. Weaning lambs or other livestock in areas within 1750 feet of the [Brandenburgers' residence] during the period of time that such livestock is bleating or bawling because of the weaning process;

4. Maintaining lights on the [450 acres] that shine directly on the [Brandenburgers'] property;

5. Disposing of dead animals on the [450 acres].

By dates specified in the judgment, the Holubecs must:

6. Clean the feedlot area of manure, spilled feed and hay residue in such a manner that substantially all fly breeding areas are destroyed, feedlot odor is remediated [sic] and hay residue will not provide a breeding site for stable flies or produce mold.

7. Remove all feeders from the pens in the approximately 10 acre feedlot adjacent to [the Brandenburgers'] property;

8. Remove all sheds and water troughs from the pens ... and remove or disconnect all water lines within [the feedlot];

9. Remove the wire fencing and feedlot pens now existing ...;

10. Remove overhead light [in the feedlot] adjacent to [the Brandenburgers'] property.

The Holubecs bring three assignments of error. We will consider them in order.

## STATUTORY BAR

Against the Brandenburgers' nuisance action, the Holubecs interposed a defense embodied in section 251.004(a) of the Texas Agriculture Code. The statute provides as follows:

No nuisance action may be brought against an agricultural operation that has lawfully been in operation for one year or more prior to the date on which the action is brought, if the conditions or circumstances complained of as constituting the basis for the nuisance action have existed substantially unchanged since the established date of operation.

Tex. Agric. Code Ann. § 251.004(a) (West 1982).

The term "agricultural operation" includes "raising or keeping livestock." *Id.* § 251.002(1). The term "established date of operation" means "the date on which an agricultural operation commenced operation." *Id.* § 251.003. If the original physical facilities of an agricultural operation are expanded, however, the expanded operation acquires "a separate and independent established date of operation," which is the date the expanded operation commenced. *Id.* Section 251.004(a) and the related statutes mentioned have the purpose of reducing loss of the State's "agricultural resources by limiting the circumstances under which agricultural operations will be ... considered to be a nuisance." *Id.* § 251.001.

The charge contained the following Question Eight: "Have the conditions or circumstances complained of as constituting the basis for the nuisance action ... remained substantially unchanged since December 31, 1986?" The jury answered "No." The Holubecs do not challenge the evidentiary sufficiency of this finding.

Contending the uncontroverted evidence established as a matter of law their defense based on section 251.004(a), the Holubecs moved for judgment notwithstanding the verdict. The trial court overruled the motion. In their first assignment of error, the Holubecs contend this amounted to reversible error.

The Brandenburgers filed their original petition, alleging a nuisance cause of action, on July 31, 1998. That date is more than one year after March 19, 1997, the undisputed date the Holubecs commenced operations of their newly erected feedlot after "expanding" the fenced twenty-acre pasture into the smaller but more intensive ten-acre feedlot consisting of iron-pipe pens, dead pits, lagoons, and water-delivery system, none of which had been in place previously. The issue is whether these facts establish the defense as a matter of law.

The parties devote the initial part of their respective arguments to whether section 251.004(a) is a "statute of limitations" or another kind of "statute of repose." *See Dallas Mkt. Ctr. Dev. Co. v. Beran & Shelmire,* 824 S.W.2d 218, 220–22 (Tex. App.—Dallas 1991, writ denied); 2 *McDonald's Texas Civil Practice* § 961, at 412–14 (1992). We need not discuss that issue or the force and effect of the evidence in comparison to what the statute requires. The Holubecs' contention depends upon an interpretation of section 251.004(a) that is untenable under the very terms of the statute, whatever its proper classification may be.

■ Section 251.004(a) provides an agricultural operation an affirmative defense, whether as a statute of limitation or another matter of confession and avoidance. *See* Tex.R. Civ. P. 94. The Holubecs interpret section 251.004(a) to mean that the defense is established merely by proof that

the plaintiff failed to file his nuisance action before the lapse of one year from the defendant's "established date of operation." This is incorrect.

■ Section 251.004(a) requires that the defendant establish *two* elements: (1) his agricultural operation has been in lawful operation for one year or more before the date the plaintiff filed his nuisance action; *and* (2) "the conditions or circumstances" alleged as the basis of the plaintiff's nuisance action "have existed substantially unchanged since the established date of operation," whether the defendant's original "date of operation" or a subsequent "date of operation" resulting from an expansion of the defendant's physical facilities. This is, in our view, the undeniable and natural import of the language found in section 251.004(a).

■ The conjunctive "if," found in section 251.004(a), introduces a proviso that conditions the bar found in the first clause of the compound sentence. The bar of the first clause and the proviso of the second clause were plainly intended by the legislature to be interdependent parts of a whole; the bar is burdened by the proviso and may not be enforced independently of it. *See Texas & Pac. Ry. Co. v. State,* 124 Tex. 482, 78 S.W.2d 580, 582 (1935). The burden therefore lay upon the Holubecs to establish both elements of the affirmative defense; the Brandenburgers did not bear the burden of negating either element. *See Spence v. Fenchler,* 107 Tex. 443, 180 S.W. 597, 607 (1915); *State v. Hart,* 753 S.W.2d 213, 214 (Tex.App.—Beaumont 1988, writ denied); *Cantu Trucking & Materials Co. v. State,* 735 S.W.2d 642, 646 (Tex.App.—Austin 1987, writ denied); *Michelle Corp. v. El Paso Retailers Ass'n,* 626 S.W.2d 615, 616–17 (Tex.App.—El Paso 1981, writ ref'd n.r.e.); *Williams v. State,* 514 S.W.2d 772, 777 (Tex.Civ.App.—Beaumont 1974, writ ref'd n.r.e.).

The proviso was included for a purpose and must be given its intended meaning and effect. *See Cameron v. Terrell & Garrett,* 618 S.W.2d 535, 540 (Tex.1981). The Holubecs' interpretation of section 251.004(a) gives exclusive force and effect to the first clause of section 251.004(a) and denies any effect whatever to the proviso "if the conditions or circumstances complained of as constituting the basis for the nuisance action have existed substantially unchanged since the established date of operation." We therefore overrule the Holubecs' first assignment of error.

## ERROR IN THE CHARGE

In their second assignment of error, the Holubecs contend the trial judge abused his discretion in two particulars: (1) by including in the charge, over their objection, Question Eight quoted previously; and (2) by refusing to include in the charge their requested version of Question Eight set forth below.

The Holubecs objected to Question Eight as follows:

> Question 8, we would object to the question in its form particularly the date on there of December 31, 1986. I am marking what I have marked as Question No. 8, Defendants' proposed Question No. 8 which we believe is a substantially correct version of the issue which would be submitted and request the Court and get [sic] the court's ruling on that question.

The trial court overruled the objection. The version of Question Eight requested in writing by the Holubecs, which the trial court refused, was as follows:

> Do you find that the *agricultural operation* of [the Holubecs] had been in operation and existed substantially unchanged since on or before July 30, 1997?

You are instructed that an agricultural operation includes the raising or keeping of livestock.

Answer "Yes" or "no."

(Emphasis added). As noted previously, the Holubecs bore the burden of proof on the affirmative defense of section 251.004(a) to which Question Eight refers. *See W.O. Bankston Nissan, Inc. v. Walters*, 754 S.W.2d 127, 128 (Tex.1988).

Rule 274 provides that "A party objecting to a charge must point out distinctly the objectionable matter *and the grounds* of the objection." Tex.R. Civ. P. 274 (emphasis added). Rule 33.1 of the appellate rules provides as follows:

(a) *In General.* As a prerequisite to presenting a complaint for appellate review, the record must show that:

(1) the complaint was made to the trial court by a timely request, objection, or motion that:

(A) stated the *grounds* for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context; and

(B) complied with the requirements of the ... Texas Rules of Civil or Appellate Procedure....

Tex.R.App. P. 33.1(a) (emphasis added).

■ *The Objection.* The Holubecs' objection, quoted above in its entirety, points out no objectionable matter in Question Eight except the date of December 31, 1986; and, their objection states no ground or basis for the objection. It is a naked objection and nothing more. Was a specific ground apparent from the context, as contemplated by Rule 33.1(a)(1)(A) of the appellate rules? We believe the context includes the Holubecs' proffered version of Question Eight, quoted above. Insofar as the date is concerned, the Holubecs' version indicates a contention that July 30, 1997, was the correct date. But the objection suggests no ground for this contention. Looking to the Holubecs' pleading in connection with the affirmative defense, one finds only that they alleged as follows in their answer:

[The Holubecs] completed a modification in April, 1997, without changing the geographic location or enlarging the size of the sheep feeding area which has remained constant from 1987 to present. [The Brandenburgers] filed suit on July 31, 1998, more than ten years after [the Holubecs'] operation was begun and more than one year after Defendants remodeled their physical facilities.

We cannot find that the date of July 30, 1997, is mentioned in the Holubecs' pleading. We therefore conclude the Holubecs failed to "explain the grounds for [their] complaint" and thus "did not give the trial court an opportunity to correct any mistake." *Wilgus v. Bond*, 730 S.W.2d 670, 672 (Tex.1987). As a result, their objection did not preserve the error for which they now contend and nothing is presented for our review in that regard. *See* Tex.R. Civ. P. 274; Tex.R.App. P. 33.1(a)(1)(A), (B).

*The Requested Submission.* The Holubecs complain that the trial judge abused his discretion when he refused to submit their version of Question Eight. We will construe the complaint as one of substantive error under Rule 278. That rule places trial judges under a non-discretionary duty "to submit the questions in the form prescribed by Rule 277, which are raised by the written pleadings and the evidence." Tex.R. Civ P. 278; *see Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 664 n. 7 (Tex.1999); *Triplex Communications, Inc. v. Riley*, 900 S.W.2d 716,

718 (Tex.1995); *Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex.1992).

■ Rule 278 also provides that "[f]ailure to submit a question shall not be deemed a ground for reversal of the judgment, unless its submission, in substantially correct wording, has been requested in writing and tendered by the party complaining of the judgment." Tex.R. Civ. P. 278.[2] We turn then to whether the question tendered by the Holubecs, which the trial court refused, was "in substantially correct wording." "Substantially correct" means a question that is "in substance and in the main correct, *and that is not affirmatively incorrect.*" *Placencio v. Allied Indus. Int'l, Inc.*, 724 S.W.2d 20, 21 (Tex. 1987) (quoting and adding emphasis to a passage in *Modica v. Howard*, 161 S.W.2d 1093, 1094 (Tex.Civ.App.—Beaumont 1942, no writ)).

We believe the version of Question Eight tendered by the Holubecs was not in substantially correct wording, and that it was, indeed, affirmatively incorrect. First, the question omits entirely the proposition found in the second clause of section 251.004(a), which states as follows: "if the *conditions or circumstances complained of as constituting the basis for the nuisance action* have existed substantially unchanged since the established date of operation." Tex. Agric. Code Ann. § 251.004(a) (emphasis added). Second, the question requested by the Holubecs is affirmatively incorrect because, in lieu of the proviso just quoted, the question asks something not contemplated at all by section 251.004(a), namely: whether the jury finds that the Holubecs' "*agricultural op-*

eration ... had been in operation and existed substantially unchanged since on or before July 30, 1977?" (emphasis added.) We hold accordingly.

For the reasons given, we overrule the Holubecs' second assignment of error.

## MOTION TO MODIFY JUDGMENT

Following rendition of judgment in the trial court, the Holubecs moved to modify the judgment in particulars discussed below. The trial judge overruled the motion. The Holubecs contend this amounted to reversible error.

■ *Effect of the Jury Finding of Real Property Damages.* In their motion to modify the judgment, as they do here by assignment of error, the Holubecs point to the jury finding that the nuisance created by the Holubecs, or their negligence, proximately caused a reduction in the market value of the Brandenburger property equal to $12,932.50. The Holubecs contend this finding amounts to a conclusive determination that the Brandenburgers possess an adequate legal remedy that precluded equitable relief in the form of an injunction.

■ It is settled, of course, that the equitable remedy of injunctive relief is ordinarily available only when the legal remedy of damages will not be adequate. *See Rogers v. Daniel Oil & Royalty Co.*, 130 Tex. 386, 110 S.W.2d 891, 893–94 (1937); 4 *Pomeroy's Equity Jurisprudence* § 1349, at 954 (5th ed.1941). The jury's finding of $12,932.50 as damages does not, however, have the conclusive effect for which the Holubecs contend. "The question of whether the [plaintiffs] had an adequate

---

2. Rule 278 continues with the following proviso: "provided, however, that objection to such failure shall suffice in such respect if the question is one relied upon by the opposing party." Tex.R. Civ. P. 278. It is obvious here that the Brandenburgers did not rely upon the

affirmative defense of section 251.004(a), the foundation of Question Eight, which the trial court submitted, and the question requested by the Holubecs which the court refused to include in the charge.

legal remedy at law was for the court and not the jury." *King v. Miller,* 280 S.W.2d 331, 334 (Tex.Civ.App.—Eastland 1955, writ ref'd n.r.e.). Whether a plaintiff seeking injunctive relief possesses an adequate legal remedy in damages involves considerations outside a jury's competence. *See* 66 C.J.S. *Nuisances* §§ 100, 101, at 657–60 (1998). We overrule the assignment of error.

*Balancing the Equities and Hardships.* In their motion to modify the judgment, as they do here by assignment of error, the Holubecs contend injunctive relief was precluded on the ground discussed below and the Brandenburgers should be relegated to their legal remedy of damages, in this instance the $12,932.50 found by the jury as the reduction in market value of the Brandenburger property.

The Holubecs' argument under the assignment of error indicates they urge the balancing-of-equities or comparative-injury doctrine applicable in nuisance cases. *See* Rafael H. Flores, *Equity–Injunctions in Nuisance Cases—Adequacy of Remedy at Law,* 28 Tex. L.Rev. 723 (1950); John J. Cox, *Doctrine of Comparative Injury in Suits to Enjoin Nuisances,* 6 Tex. L.Rev. 83 (1927). The doctrine has been stated briefly as follows:

> If the defendant is conducting an enterprise of social value exceeding the social value of the plaintiff's interests, the common weal may be best served by permitting the defendant's plant to remain undisturbed, requiring him to compensate the plaintiff for his financial losses, and punishing him sufficiently for mislocating his plant to discourage similar future wrongdoing.

Morris Keeton, *Notes on "Balancing the Equities,"* 18 Tex. L.Rev. 412, 425 (1940). The Supreme Court of Texas has explained the doctrine at greater length as follows:

In determining whether a business is a nuisance per accidens the fact that the business is a useful or necessary one or that it contributes to the welfare and prosperity of the community is not determinative, but when expensive plants have been erected and are used in carrying on a useful business adjacent property owners will not be permitted to maintain actions for every trifling annoyance which such business causes them.... On the other hand the law does not allow one to be driven from his home or compelled to live in substantial danger or discomfort even though the danger or discomfort is caused by a lawful and useful business.

. . . .

According to the doctrine of "comparative injury" or "balancing of equities" the court will consider the injury which may result to the defendant and the public by granting the injunction as well as the injury to be sustained by the complainant if the writ be denied. If the court finds that the injury to the complainant is slight in comparison to the injury caused the defendant and the public by enjoining the nuisance, relief will ordinarily be refused. It has been pointed out that the cases in which a nuisance is permitted to exist under this doctrine are based on the stern rule of necessity rather than on the right of the author of the nuisance to work a hurt or injury to his neighbor. The necessity of others may compel the injured party to seek relief by way of an action at law for damages rather than by a suit in equity to abate the nuisance.

Some one must suffer these inconveniences rather than that the public interest should suffer.... These conflicting interests call for a solution to the question by the application of the broad principles of right and justice, leaving the

individual to his remedy by compensation and maintaining the public interests intact; this works hardships on the individual, but they are incident to civilization with its physical developments. . . . On the other hand, an injunction may issue where the injury to the opposing party and the public is slight or disproportionate to the injury suffered by the complainant.

*Storey v. Central Hide & Rendering Co.,* 148 Tex. 509, 226 S.W.2d 615, 618–19 (1950) (quoting with approval *King v. Columbian Carbon Co.,* 152 F.2d 636, 639 (5th Cir.1945)). As indicated by the terms "trifling annoyance," "substantial . . . discomfort," and injuries that are "slight," the doctrine requires a grave disproportion in the impact of denying or granting injunctive relief on the competing interests.[3] As *Storey* indicates, the doctrine has the purpose of protecting the public interest. *Storey,* 226 S.W.2d at 618–19.

■ The Holubecs argue as follows: their feedlot is a lawful and necessary business; and, they identify their position with the public interest by pointing out that their feedlot supplies lambs to the nation's fourth largest slaughterhouse in San Angelo. Their feedlot is, moreover, situated in a rural agricultural area where all homeowners are expected to tolerate some insubstantial amount of dust, odors, and flies that might amount to a nuisance. And, the Holubecs argue, they also farm their lands and the feedlot enables them to diversify their operations and thus manage better the risks inherent in agricultural pursuits. In short, the Holubecs seek to bring themselves within "the stern rule of necessity" that injunctive relief will be refused when "the court finds that the injury to the complainant is slight in comparison to the injury caused the defendant and the public."

■ We cannot conclude the trial judge abused his discretion by his injunction order. The Brandenburgers' suit for injunctive relief invoked the equity jurisdiction of the trial court, and even in the context of a jury trial, the judge, as chancellor, was authorized to draw inferences and conclusions from the evidence in balancing the hardships and equities of the case. *Hill v. Villarreal,* 383 S.W.2d 463, 465–66 (Tex.Civ.App.—San Antonio 1964, writ ref'd n.r.e.). "The essence of equity jurisdiction has been the power of the chancellor to do equity and to mold each decree to the necessities of the particular case [in] reconciling between the public interest and private needs as well as between competing private claims." *Greater Fort Worth v. Mims,* 574 S.W.2d 870, 872 (Tex.Civ.App.—Fort Worth 1978, writ dismissed). In effectuating this reconciliation, the factors to be considered have been broadly classified as follows: (1) the extent to which the defendant has endeavored to control or eliminate the objectionable features of the activity found to be a nuisance; (2) any adverse effect upon public convenience and necessity; (3) any economic burden caused the defendant by prohibiting or modifying the activity complained of; (4) the nature of the locality involved; (5) the willfulness of the defendant's actions; (6) the adequacy of any

---

**3.** *Cf. Estancias Dallas Corp. v. Schultz,* 500 S.W.2d 217, 219–21 (Tex.Civ.App.—Beaumont 1973, writ ref'd n.r.e.); *Ellen v. City of Bryan,* 410 S.W.2d 463, 465–66 (Tex.Civ. App.—Waco 1966, writ ref'd n.r.e.); *King v. Miller,* 280 S.W.2d 331, 335 (Tex.Civ.App.— Eastland 1955, writ ref'd n.r.e.); and, *Hall v. Muckleroy,* 411 S.W.2d 390, 392–93 (Tex.Civ. App.—Beaumont 1967, writ ref'd n.r.e.); *Schiller v. Raley,* 405 S.W.2d 446, 447 (Tex. Civ.App.—Waco 1966, no writ); *Garland Grain Co. v. D–C Home Owners Improvement Ass'n,* 393 S.W.2d 635, 641–43 (Tex.Civ. App.—Tyler 1965, writ ref'd n.r.e.); *Hill v. Villarreal,* 383 S.W.2d 463, 465–67 (Tex.Civ. App.—San Antonio 1964, writ ref'd n.r.e.).

legal remedy; and, (7) the substantiality of the plaintiff's interests and rights and the degree of harm sustained by reason of the activity. *See generally* Jonathan M. Purver, *Modern Status of Rules as to Balance of Convenience or Social Utility as Affecting Relief from Nuisance,* 40 A.L.R.3d 601 (1971).

One observes that the judgment does not simply prohibit the feedlot operation. In substance, the judgment permits the operation to continue on the 450 acres or elsewhere but at a distance sufficiently removed from the Brandenburgers' residence to eliminate the objectionable consequences of the operation and the harms sustained by the Brandenburgers. The judgment thus appears to have been tailored to fairly reconcile and preserve the parties' competing interests and claims as near as could be done.

From the body of evidence, the trial judge could reasonably have concluded as follows: there is a serious disproportion between the $75,284.19 that the Holubecs spent to erect the feedlot improvements and the $12,932.50 reduction in market value of the Brandenburger residence. However, the Holubecs adduced no evidence to show what the relocation of the feedlot to another part of the 450 acres or another of their properties would cost them; and, at trial they offered no alternate remedy that would eliminate the harm sustained by the Brandenburgers while preserving their own interest. *See Nichols v. Simpson,* 308 S.W.2d 613, 615 (Tex.Civ.App.—San Antonio 1957, writ ref'd n.r.e.). Indeed, the Holubecs' position at trial was that they would not move the feedlot unless ordered to do so by the trial court. Notwithstanding David Holubec's testimony that he took certain measures to control the breeding of flies at the feedlot and dead pits, the measures were insufficient or not actually taken. And in light of contrary evidence and Holubec's inconsistent testimony, it was not true that weaning lambs do not bawl, that his feedlot did not create dust or breed flies, that he erected the feedlot improvements before the Brandenburger residence was built, that the feedlot did not cause foul odors, that dead lambs were removed on discovery after thrice-daily inspections, that they were covered each time by a layer of soil, and that the operation did not attract buzzards. Any adverse effect upon the public interest, by abating or moving the feedlot operation elsewhere on the 450 acres or another of the Holubecs' properties, was slight or trifling at best. The Holubecs invoke the public interest only by stating that their lambs supply the San Angelo slaughterhouse. Nothing in the record suggests however that the slaughterhouse cannot be supplied from another location on the 450 acres or another Holubec property; and, no evidence demonstrates the slaughterhouse will be seriously affected even if the Holubecs suspend feedlot operations entirely. While the feedlot is a lawful and useful business, it was not shown to be required for the public convenience or necessity, nor even profitable to the Holubecs personally. Similarly, nothing in the evidence demonstrates that the feedlot cannot be located elsewhere on the 450 acres or another Holubec property without affecting adversely another neighbor in the essentially rural ranching area. Nor does the evidence show that the "necessity of others," in the words of *Storey,* will not be met unless the Brandenburgers are compelled to live permanently under the nuisance conditions. *See Estancias Dallas Corp. v. Schultz,* 500 S.W.2d 217, 222 (Tex.Civ. App.—Beaumont 1973, writ ref'd n.r.e.). The Holubecs' actions appear willful to a serious degree, resulting in an inconvenience or difficult situation that they themselves created. They located their feedlot

and dead pits next to their neighbor's *existing* home, admittedly without giving any thought to the ill effects their operation might have on their neighbor; they spurned attempts to rectify the problem in a mutually agreeable way; and, they offered at trial no alternate remedy to relocating the feedlot and dead pits.

The legal remedy of damages appears to be inadequate. The Brandenburgers live where they do by reason of Carl Brandenburger's employment as foreman of the large ranch on which his residence is situated; the nuisance is continuing; and, damages would appear to be inadequate to compensate for the hardship occasioned the Brandenburgers by their having to relocate. The Brandenburgers' use and enjoyment of their residence is a substantial interest adversely affected by the odors, flies, dust, and other conditions created by the feedlot. The annoyance and discomfort caused them by the feedlot cannot reasonably be viewed as "slight" or "trifling," in the words of *Storey,* and under the totality of the evidence, injunctive relief in the form ordered by the trial court is the most tailored, practical, and efficient remedy for reconciling the competing interest and claims. Or so the trial judge could reasonably conclude from the evidence.

The Holubecs argue under the same heading that the jury's negative answer to Question Four, inquiring as to the amount of money reasonably necessary to compensate the Brandenburgers for personal discomfort, annoyance, inconvenience, and so forth, proximately caused by the nuisance, renders the injunction measures ordered by the trial court disproportionate. This contention rests upon an incorrect assumption. The jury's negative answer to Question Four does not establish that the Brandenburgers sustained no injury by reason of the nuisance conditions. Under the instructions accompanying Question One, the jury could not have found that the feedlot constituted a nuisance unless the jury also concluded the Brandenburgers' use and enjoyment of their property was harmed by conditions that were offensive, discomforting, and annoying to persons of ordinary sensibility, tastes, and habits of living in the locality. The jury's negative answer to Question Four means no more than the Brandenburgers failed to carry their burden of establishing, by a preponderance of the evidence, the amount of money inquired about. *See Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989); *C & R Transport, Inc. v. Campbell,* 406 S.W.2d 191, 194 (Tex.1966).

We hold the trial court did not abuse its discretion by an unreasonable balancing of the equities and hardships.

Finding no error, we affirm the trial-court judgment.