TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-00-00684-CV







David Holubec and Mary Holubec, Appellants



v.



Carl Brandenburger, Individually, and as Next Friend of Payton Brandenburger and 

Carson Brandenburger, Kathy Brandenburger, William R. Lee, Laverne Lee, 

and R&J Livestock Company and Batesville Farming Company, Appellees






FROM THE DISTRICT COURT OF MCCULLOCH COUNTY, 198TH JUDICIAL DISTRICT


NO. 1998084, HONORABLE CHARLES E. SHERRILL, JR., JUDGE PRESIDING






 David and Mary Holubec (the "Holubecs") appeal from a judgment recovered on the
jury's verdict by several plaintiffs whom we will refer to collectively as the "Brandenburgers." (1) We
will affirm the judgment.


THE CONTROVERSY


 The Brandenburgers alleged against the Holubecs a nuisance action based upon
conditions allegedly created by the Holubecs' feedlot adjacent to the Brandenburgers' home, namely: 
great deposits of manure, muddy hollows, rotting feed, and decaying animal bodies that gave rise
to hordes of flies, clouds of manure-laden dust, mold spores, insecticides, and foul and obnoxious
odors that invaded the Brandenburgers' property; bawling lambs confined in the feedlot for weaning;
and, bright elevated lights that illuminated the Brandenburgers' home at night and prevented their
sleeping. The jury found these conditions amounted to a nuisance and the Brandenburgers recovered
judgment restraining the Holubecs from certain actions regarding the feedlot and requiring or
permitting other matters. 

 To understand properly the Holubecs' appellate complaints, it is necessary that we
summarize the body of evidence, the verdict, and the final judgment. The Holubecs and
Brandenburgers share a common boundary. The Holubecs own three contiguous tracts of rural land
totaling about 450 acres. Their feedlot lies against their western boundary and 135 feet from the
Brandenburgers' home, which is situated just inside their eastern boundary. In addition to the 450
acres, the Holubecs own and lease other land in the vicinity amounting to about 4,500 acres. On
their various properties, they ordinarily have about 3,000 ewes year in and year out and realize
annually almost as many lambs. These lambs, together with others acquired by the Holubecs, are
confined in the feedlot for weaning.

 Before they purchased the three tracts of land comprising the 450 acres, the Holubecs
leased one of the tracts. They fed sheep in a fenced twenty-acre pasture on the leased tract. They
purchased the tract subsequently and converted part of the twenty-acre pasture to a ten-acre feedlot
consisting of iron-pipe pens, feed troughs, and other small structures. According to David Holubec's
testimony, he designed the feedlot to accommodate 6,000 lambs and, from time to time, as many as
5,800 head were confined therein. Another witness testified the facility would accommodate 10,000
head. According to the Holubecs' evidence, the feedlot improvements were completed in June 1997,
at a cost of $75,284.19, and at the time of trial had a depreciated value of $40,284.19 for income-tax
purposes. No evidence was adduced to show the cost of moving the pens and other structures to
another location or whether the feedlot was a profitable operation. The feedlot is not the Holubecs'
livelihood. They make their living from farming and from their fertilizer and seed businesses. 
Although David Holubec testified he built the ten-acre feedlot before the Brandenburger home was
erected in 1993, he was shown to be mistaken by testimony of other witnesses, county tax records,
and an aerial photograph published by the United States Department of Agriculture. These show the
feedlot was not constructed until several years after the Brandenburger home was built and occupied.

 The Brandenburgers introduced testimony as follows: the conditions amounting to
a nuisance did not exist so long as the Holubecs confined and fed a number of sheep in the twenty-acre pasture from which the ten acres were carved to build the feedlot; the nuisance conditions began
when thousands of lambs were confined in the newly constructed feedlot pens. It was then that
manure began to accumulate in large quantities, lambs began dying in sizeable numbers, dead
animals were placed in nearby "dead pits," two lagoons were dug to catch runoff from the pens, and
watering the animals in the feedlot resulted in muddy bogs, all of which furnished breeding grounds
for flies, caused foul odors, and during dry periods led to dust that invaded the Brandenburger
residence along with the flies, odors, and loud noise of bawling lambs.

 The Holubecs confine lambs in the feedlot for about a ninety-day period during which
the lambs are weaned from mother's milk to feed. About two percent of the lambs, or some 120
animals, die in the feedlot during such periods. According to David Holubec's testimony, the feedlot
is checked for dead bodies at least three times each day. The dead bodies are removed immediately
on being discovered and are placed in the dead pits where they are covered with a layer of soil to
prevent flies and discourage scavengers. Photographic evidence was introduced, however, showing
that some of the dead bodies were not covered for weeks or months and were in a state of decay. 
David Holubec testified that when he dug the dead pits, he never thought about whether they would
result in odors that might bother his neighbors. 

 David Holubec testified further as follows: the elevated lights of which the
Brandenburgers complained were erected to enable him to observe the lambs in the feedlot in
darkness, and to move the animals about in the night; his feedlot and dead pits do not breed flies or
produce dust or foul odors, nor do they attract buzzards; the weaning lambs in the feedlot do not
bawl; and the flies of which the Brandenburgers complain do not come from his feedlot because he
took measures to prevent their breeding. This testimony was contradicted absolutely by other
evidence, including testimony given by the Brandenburgers, photographs, and contrary answers to
written interrogatories given by David Holubec himself before trial. The contradictory evidence
included the testimony of an entomologist who inspected the dead pits, the lagoons, the feedlot, and
other aspects of the feedlot operation. In his opinion, the flies were bred in the dead pits and other
specified locations in the feedlot. He was unable to find any condition on the Brandenburger
property from which the flies might have come.

 No evidence was adduced to show the Holubecs could not operate the feedlot
elsewhere on their 450-acre tract or on another of their nearby properties where the operation would
not bother a neighbor. David Holubec testified he was "not going to change the way" he operated
the feedlot unless made to do so by the court; and he intends to keep the feedlot permanently where
it is now. He admitted he never replied to inquiries from the Brandenburgers seeking to arrive at a
mutually agreeable solution to the feedlot problem, and conceded he "ignored" the inquiries.

 In response to Questions One and Ten, the jury found the feedlot was a permanent
nuisance; in response to Question Three, the jury answered that the Holubecs had negligently
constructed or operated the feedlot; in answer to Question Four, the jury failed to find any sum of
money that would fairly and reasonably compensate the Brandenburgers for damages caused them
by the nuisance or negligence, considering the elements of personal discomfort, annoyance,
inconvenience, sickness, medical care, physical pain, and mental anguish; and, in answer to
Questions Five and Six, the jury found the nuisance or negligence proximately caused a $12,932.50
reduction in the market value of the Brandenburger property. In response to Question Nine, the jury
found the Holubecs had obstructed the normal flow of air to the Brandenburger land.

 The trial court rendered judgment as follows:


 On or before September 10, 2000, the Holubecs must desist and refrain from the
following acts:


 Operating a sheep feedlot or stabling, confining, feeding or maintaining on the
[450 acres] any animals in confinement areas that do not sustain such animals on
the crops, vegetation, forage growth, or post harvest residues produced in such
areas in the normal growing season;

 Feeding hay or other feed within 1750 feet of the [Brandenburgers'] residence;

 Weaning lambs or other livestock in areas within 1750 feet of the
[Brandenburgers' residence] during the period of time that such livestock is
bleating or bawling because of the weaning process;




 Maintaining lights on the [450 acres] that shine directly on the [Brandenburgers']
property;

 Disposing of dead animals on the [450 acres].



By dates specified in the judgment, the Holubecs must:



 Clean the feedlot area of manure, spilled feed and hay residue in such a manner
that substantially all fly breeding areas are destroyed, feedlot odor is remediated
[sic] and hay residue will not provide a breeding site for stable flies or produce
mold.

 Remove all feeders from the pens in the approximately 10 acre feedlot adjacent
to [the Brandenburgers'] property;

 Remove all sheds and water troughs from the pens . . . and remove or disconnect
all water lines within [the feedlot];

 Remove the wire fencing and feedlot pens now existing . . . ;




 Remove overhead light [in the feedlot] adjacent to [the Brandenburgers'] property.




 The Holubecs bring three assignments of error. We will consider them in order.


STATUTORY BAR


 Against the Brandenburgers' nuisance action, the Holubecs interposed a defense
embodied in section 251.004(a) of the Texas Agriculture Code. The statute provides as follows:


 No nuisance action may be brought against an agricultural operation that has lawfully
been in operation for one year or more prior to the date on which the action is
brought, if the conditions or circumstances complained of as constituting the basis
for the nuisance action have existed substantially unchanged since the established
date of operation.



Tex. Agric. Code Ann. § 251.004(a) (West 1982). 

 The term "agricultural operation" includes "raising or keeping livestock." Id.
§ 251.002(1). The term "established date of operation" means "the date on which an agricultural
operation commenced operation." Id. § 251.003. If the original physical facilities of an agricultural
operation are expanded, however, the expanded operation acquires "a separate and independent
established date of operation," which is the date the expanded operation commenced. Id. Section
251.004(a) and the related statutes mentioned have the purpose of reducing loss of the State's
"agricultural resources by limiting the circumstances under which agricultural operations will be . . . 
considered to be a nuisance." Id. § 251.001.

 The charge contained the following Question Eight: "Have the conditions or
circumstances complained of as constituting the basis for the nuisance action . . . remained
substantially unchanged since December 31, 1986?" The jury answered "No." The Holubecs do not
challenge the evidentiary sufficiency of this finding.

 Contending the uncontroverted evidence established as a matter of law their defense
based on section 251.004(a), the Holubecs moved for judgment notwithstanding the verdict. The
trial court overruled the motion. In their first assignment of error, the Holubecs contend this
amounted to reversible error.

 The Brandenburgers filed their original petition, alleging a nuisance cause of action, 
on July 31, 1998. That date is more than one year after March 19, 1997, the undisputed date the
Holubecs commenced operations of their newly erected feedlot after "expanding" the fenced twenty-acre pasture into the smaller but more intensive ten-acre feedlot consisting of iron-pipe pens, dead
pits, lagoons, and water-delivery system, none of which had been in place previously. The issue is
whether these facts establish the defense as a matter of law.

 The parties devote the initial part of their respective arguments to whether section
251.004(a) is a "statute of limitations" or another kind of "statute of repose." See Dallas Mkt. Ctr.
Dev. Co. v. Beran & Shelmire, 824 S.W.2d 218, 220-22 (Tex. App.--Dallas 1991, writ denied); 2
McDonald's Texas Civil Practice § 961, at 412-14 (1992). We need not discuss that issue or the
force and effect of the evidence in comparison to what the statute requires. The Holubecs'
contention depends upon an interpretation of section 251.004(a) that is untenable under the very
terms of the statute, whatever its proper classification may be.

 Section 251.004(a) provides an agricultural operation an affirmative defense, whether
as a statute of limitation or another matter of confession and avoidance. See Tex. R. Civ. P. 94. The
Holubecs interpret section 251.004(a) to mean that the defense is established merely by proof that
the plaintiff failed to file his nuisance action before the lapse of one year from the defendant's
"established date of operation." This is incorrect.

 Section 251.004(a) requires that the defendant establish two elements: (1) his
agricultural operation has been in lawful operation for one year or more before the date the plaintiff
filed his nuisance action; and (2) "the conditions or circumstances" alleged as the basis of the
plaintiff's nuisance action "have existed substantially unchanged since the established date of
operation," whether the defendant's original "date of operation" or a subsequent "date of operation"
resulting from an expansion of the defendant's physical facilities. This is, in our view, the
undeniable and natural import of the language found in section 251.004(a).

 The conjunctive "if," found in section 251.004(a), introduces a proviso that conditions
the bar found in the first clause of the compound sentence. The bar of the first clause and the proviso
of the second clause were plainly intended by the legislature to be interdependent parts of a whole;
the bar is burdened by the proviso and may not be enforced independently of it. See Texas & Pac.
Ry. Co. v. State, 78 S.W.2d 580, 582 (Tex. 1935). The burden therefore lay upon the Holubecs to
establish both elements of the affirmative defense; the Brandenburgers did not bear the burden of
negating either element. See Spence v. Fenchler, 180 S.W. 597, 607 (Tex. 1915); State v. Hart, 753
S.W.2d 213, 214 (Tex. App.--Beaumont 1988, writ denied); Cantu Trucking & Materials Co. v.
State, 735 S.W.2d 642, 646 (Tex. App.--Austin 1987, writ denied); Michelle Corp. v. El Paso
Retailers Ass'n, 626 S.W.2d 615, 616-17 (Tex. App.--El Paso 1981, writ ref'd n.r.e.); Williams v.
State, 514 S.W.2d 772, 777 (Tex. Civ. App.--Beaumont 1974, writ ref'd n.r.e.).

 The proviso was included for a purpose and must be given its intended meaning and
effect. See Cameron v. Terrell & Garrett, 618 S.W.2d 535, 540 (Tex. 1981). The Holubecs'
interpretation of section 251.004(a) gives exclusive force and effect to the first clause of section
251.004(a) and denies any effect whatever to the proviso "if the conditions or circumstances
complained of as constituting the basis for the nuisance action have existed substantially unchanged
since the established date of operation." We therefore overrule the Holubecs' first assignment of
error.


ERROR IN THE CHARGE


 In their second assignment of error, the Holubecs contend the trial judge abused his
discretion in two particulars: (1) by including in the charge, over their objection, Question Eight
quoted previously; and (2) by refusing to include in the charge their requested version of Question
Eight set forth below.

 The Holubecs objected to Question Eight as follows:



 Question 8, we would object to the question in its form particularly the date on there
of December 31, 1986. I am marking what I have marked as Question No. 8,
Defendants' proposed Question No. 8 which we believe is a substantially correct
version of the issue which would be submitted and request the Court and get [sic] the
court's ruling on that question.



 The trial court overruled the objection.



The version of Question Eight requested in writing by the Holubecs, which the trial court refused,
was as follows:


 Do you find that the agricultural operation of [the Holubecs] had been in operation
and existed substantially unchanged since on or before July 30, 1997?


 You are instructed that an agricultural operation includes the raising or keeping of
livestock.


 Answer "Yes" or "no."



(Emphasis added). As noted previously, the Holubecs bore the burden of proof on the affirmative
defense of section 251.004(a) to which Question Eight refers. See W.O. Bankston Nissan, Inc. v.
Walters, 754 S.W.2d 127, 128 (Tex. 1988). 

 Rule 274 provides that "A party objecting to a charge must point out distinctly the
objectionable matter and the grounds of the objection." Tex. R. Civ. P. 274 (emphasis added). Rule
33.1 of the appellate rules provides as follows:



 In General. As a prerequisite to presenting a complaint for appellate review, the
record must show that:
 
 the complaint was made to the trial court by a timely request, objection, or
motion that:

 
 stated the grounds for the ruling that the complaining party sought from
the trial court with sufficient specificity to make the trial court aware of
the complaint, unless the specific grounds were apparent from the
context; and

 complied with the requirements of the . . . Texas Rules of Civil or
Appellate Procedure . . . .

 
 





Tex. R. App. P. 33.1(a) (emphasis added).



 The Objection. The Holubecs' objection, quoted above in its entirety, points out no
objectionable matter in Question Eight except the date of December 31, 1986; and, their objection
states no ground or basis for the objection. It is a naked objection and nothing more. Was a specific
ground apparent from the context, as contemplated by Rule 33.1(a)(1)(A) of the appellate rules? We
believe the context includes the Holubecs' proffered version of Question Eight, quoted above. 
Insofar as the date is concerned, the Holubecs' version indicates a contention that July 30, 1997, was
the correct date. But the objection suggests no ground for this contention. Looking to the Holubecs'
pleading in connection with the affirmative defense, one finds only that they alleged as follows in
their answer:


 [The Holubecs] completed a modification in April, 1997, without changing the
geographic location or enlarging the size of the sheep feeding area which has
remained constant from 1987 to present.


 [The Brandenburgers] filed suit on July 31, 1998, more than ten years after [the
Holubecs'] operation was begun and more than one year after Defendants remodeled
their physical facilities.



We cannot find that the date of July 30, 1997, is mentioned in the Holubecs' pleading. We therefore
conclude the Holubecs failed to "explain the grounds for [their] complaint" and thus "did not give
the trial court an opportunity to correct any mistake." Wilgus v. Bond, 730 S.W.2d 670, 672 (Tex.
1987). As a result, their objection did not preserve the error for which they now contend and nothing
is presented for our review in that regard. See Tex. R. Civ. P. 274; Tex. R. App. P. 33.1(a)(1)(A),
(B).

 The Requested Submission. The Holubecs complain that the trial judge abused his
discretion when he refused to submit their version of Question Eight. We will construe the
complaint as one of substantive error under Rule 278. That rule places trial judges under a non-discretionary duty "to submit the questions in the form prescribed by Rule 277, which are raised by
the written pleadings and the evidence." Tex. R. Civ P. 278; see Hyundai Motor Co. v. Rodriguez,
995 S.W.2d 661, 664 n.7 (Tex. 1999); Triplex Communications, Inc. v. Riley, 900 S.W.2d 716, 718
(Tex. 1995); Elbaor v. Smith, 845 S.W.2d 240, 243 (Tex. 1992).

 Rule 278 also provides that "[f]ailure to submit a question shall not be deemed a
ground for reversal of the judgment, unless its submission, in substantially correct wording, has been
requested in writing and tendered by the party complaining of the judgment." Tex. R. Civ. P. 278. (2) 
We turn then to whether the question tendered by the Holubecs, which the trial court refused, was "in
substantially correct wording." "Substantially correct" means a question that is "in substance and in
the main correct, and that is not affirmatively incorrect." Placencio v. Allied Indus. Int'l, Inc., 724
S.W.2d 20, 21 (Tex. 1987) (quoting and adding emphasis to a passage in Modica v. Howard, 161
S.W.2d 1093, 1094 (Tex. Civ. App.--Beaumont 1942, no writ)).

 We believe the version of Question Eight tendered by the Holubecs was not in
substantially correct wording, and that it was, indeed, affirmatively incorrect. First, the question
omits entirely the proposition found in the second clause of section 251.004(a), which states as
follows: "if the conditions or circumstances complained of as constituting the basis for the nuisance
action have existed substantially unchanged since the established date of operation." Tex. Agric.
Code Ann. § 251.004(a) (emphasis added). Second, the question requested by the Holubecs is
affirmatively incorrect because, in lieu of the proviso just quoted, the question asks something not
contemplated at all by section 251.004(a), namely: whether the jury finds that the Holubecs'
"agricultural operation . . . had been in operation and existed substantially unchanged since on or
before July 30, 1977?" (emphasis added.) We hold accordingly.

 For the reasons given, we overrule the Holubecs' second assignment of error.


MOTION TO MODIFY JUDGMENT


 Following rendition of judgment in the trial court, the Holubecs moved to modify the
judgment in particulars discussed below. The trial judge overruled the motion. The Holubecs
contend this amounted to reversible error.


 Effect of the Jury Finding of Real Property Damages. In their motion to modify the
judgment, as they do here by assignment of error, the Holubecs point to the jury finding that the
nuisance created by the Holubecs, or their negligence, proximately caused a reduction in the market
value of the Brandenburger property equal to $12,932.50. The Holubecs contend this finding amounts
to a conclusive determination that the Brandenburgers possess an adequate legal remedy that
precluded equitable relief in the form of an injunction.

 It is settled, of course, that the equitable remedy of injunctive relief is ordinarily
available only when the legal remedy of damages will not be adequate. See Rogers v. Daniel Oil &
Royalty Co., 110 S.W.2d 891, 893-94 (Tex. 1937); 4 Pomeroy's Equity Jurisprudence § 1349, at 954
(5th ed. 1941). The jury's finding of $12,932.50 as damages does not, however, have the conclusive
effect for which the Holubecs contend. "The question of whether the [plaintiffs] had an adequate
legal remedy at law was for the court and not the jury." King v. Miller, 280 S.W.2d 331, 334 (Tex.
Civ. App.--Eastland 1955, writ ref'd n.r.e.). Whether a plaintiff seeking injunctive relief possesses
an adequate legal remedy in damages involves considerations outside a jury's competence. See 66
C.J.S. Nuisances §§ 100, 101, at 657-60 (1998). We overrule the assignment of error.

 Balancing the Equities and Hardships. In their motion to modify the judgment, as they
do here by assignment of error, the Holubecs contend injunctive relief was precluded on the ground
discussed below and the Brandenburgers should be relegated to their legal remedy of damages, in this
instance the $12,932.50 found by the jury as the reduction in market value of the Brandenburger
property.

 The Holubecs' argument under the assignment of error indicates they urge the
balancing-of-equities or comparative-injury doctrine applicable in nuisance cases. See Rafael H.
Flores, Equity-Injunctions in Nuisance Cases--Adequacy of Remedy at Law, 28 Tex. L. Rev. 723
(1950); John J. Cox, Doctrine of Comparative Injury in Suits to Enjoin Nuisances, 6 Tex. L. Rev. 83
(1927). The doctrine has been stated briefly as follows:


 If the defendant is conducting an enterprise of social value exceeding the social value
of the plaintiff's interests, the common weal may be best served by permitting the
defendant's plant to remain undisturbed, requiring him to compensate the plaintiff for
his financial losses, and punishing him sufficiently for mislocating his plant to
discourage similar future wrongdoing.



Morris Keeton, Notes on "Balancing the Equities," 18 Tex. L. Rev. 412, 425 (1940).


 The Supreme Court of Texas has explained the doctrine at greater length as follows:



 In determining whether a business is a nuisance per accidens the fact that the business
is a useful or necessary one or that it contributes to the welfare and prosperity of the
community is not determinative, but when expensive plants have been erected and are
used in carrying on a useful business adjacent property owners will not be permitted
to maintain actions for every trifling annoyance which such business causes them . . . . 
On the other hand the law does not allow one to be driven from his home or
compelled to live in substantial danger or discomfort even though the danger or
discomfort is caused by a lawful and useful business.


 . . . .


 According to the doctrine of "comparative injury" or "balancing of equities" the court
will consider the injury which may result to the defendant and the public by granting
the injunction as well as the injury to be sustained by the complainant if the writ be
denied. If the court finds that the injury to the complainant is slight in comparison to
the injury caused the defendant and the public by enjoining the nuisance, relief will
ordinarily be refused. It has been pointed out that the cases in which a nuisance is
permitted to exist under this doctrine are based on the stern rule of necessity rather
than on the right of the author of the nuisance to work a hurt or injury to his neighbor. 
The necessity of others may compel the injured party to seek relief by way of an action
at law for damages rather than by a suit in equity to abate the nuisance.


 Some one must suffer these inconveniences rather than that the public interest should
suffer . . . . These conflicting interests call for a solution to the question by the
application of the broad principles of right and justice, leaving the individual to his
remedy by compensation and maintaining the public interests intact; this works
hardships on the individual, but they are incident to civilization with its physical
developments . . . . 


 On the other hand, an injunction may issue where the injury to the opposing party and
the public is slight or disproportionate to the injury suffered by the complainant.



Storey v. Central Hide & Rendering Co., 226 S.W.2d 615, 618-19 (Tex. 1950) (quoting with
approval King v. Columbia Carbon Co., 152 F.2d 636, 639 (5th Cir. 1945). As indicated by the
terms "trifling annoyance," "substantial . . . discomfort," and injuries that are "slight," the doctrine
requires a grave disproportion in the impact of denying or granting injunctive relief on the competing
interests. (3) As Storey indicates, the doctrine has the purpose of protecting the public interest. Storey,
226 S.W.2d at 618-19.

 The Holubecs argue as follows: their feedlot is a lawful and necessary business; and,
they identify their position with the public interest by pointing out that their feedlot supplies lambs
to the nation's fourth largest slaughterhouse in San Angelo. Their feedlot is, moreover, situated in
a rural agricultural area where all homeowners are expected to tolerate some insubstantial amount
of dust, odors, and flies that might amount to a nuisance. And, the Holubecs argue, they also farm
their lands and the feedlot enables them to diversify their operations and thus manage better the risks
inherent in agricultural pursuits. In short, the Holubecs seek to bring themselves within "the stern
rule of necessity" that injunctive relief will be refused when "the court finds that the injury to the
complainant is slight in comparison to the injury caused the defendant and the public."

 We cannot conclude the trial judge abused his discretion by his injunction order. The
Brandenburgers' suit for injunctive relief invoked the equity jurisdiction of the trial court, and even
in the context of a jury trial, the judge, as chancellor, was authorized to draw inferences and
conclusions from the evidence in balancing the hardships and equities of the case. Hill v. Villarreal,
383 S.W.2d 463, 465-66 (Tex. Civ. App.--San Antonio 1964, writ ref'd n.r.e.). "The essence of
equity jurisdiction has been the power of the chancellor to do equity and to mold each decree to the
necessities of the particular case [in] reconciling between the public interest and private needs as
well as between competing private claims." Greater Fort Worth v. Mims, 574 S.W.2d 870, 872
(Tex. Civ. App.--Fort Worth 1978, writ dismissed). In effectuating this reconciliation, the factors 
to be considered have been broadly classified as follows: (1) the extent to which the defendant has
endeavored to control or eliminate the objectionable features of the activity found to be a nuisance;
(2) any adverse effect upon public convenience and necessity; (3) any economic burden caused the
defendant by prohibiting or modifying the activity complained of; (4) the nature of the locality
involved; (5) the willfulness of the defendant's actions; (6) the adequacy of any legal remedy; and,
(7) the substantiality of the plaintiff's interests and rights and the degree of harm sustained by reason
of the activity. See generally Jonathan M. Purver, Modern Status of Rules as to Balance of
Convenience or Social Utility as Affecting Relief from Nuisance, 40 A.L.R.3d 601 (1971).

 One observes that the judgment does not simply prohibit the feedlot operation. In
substance, the judgment permits the operation to continue on the 450 acres or elsewhere but at a
distance sufficiently removed from the Brandenburgers' residence to eliminate the objectionable
consequences of the operation and the harms sustained by the Brandenburgers. The judgment thus
appears to have been tailored to fairly reconcile and preserve the parties' competing interests and
claims as near as could be done.

 From the body of evidence, the trial judge could reasonably have concluded as
follows: there is a serious disproportion between the $75,284.19 that the Holubecs spent to erect the
feedlot improvements and the $12,932.50 reduction in market value of the Brandenburger residence. 
However, the Holubecs adduced no evidence to show what the relocation of the feedlot to another
part of the 450 acres or another of their properties would cost them; and, at trial they offered no
alternate remedy that would eliminate the harm sustained by the Brandenburgers while preserving
their own interest. See Nichols v. Simpson, 308 S.W.2d 613, 615 (Tex. Civ. App.--San Antonio
1957, writ ref'd n.r.e.). Indeed, the Holubecs' position at trial was that they would not move the
feedlot unless ordered to do so by the trial court. Notwithstanding David Holubec's testimony that
he took certain measures to control the breeding of flies at the feedlot and dead pits, the measures
were insufficient or not actually taken. And in light of contrary evidence and Holubec's inconsistent
testimony, it was not true that weaning lambs do not bawl, that his feedlot did not create dust or
breed flies, that he erected the feedlot improvements before the Brandenburger residence was built,
that the feedlot did not cause foul odors, that dead lambs were removed on discovery after thrice-daily inspections, that they were covered each time by a layer of soil, and that the operation did not
attract buzzards. Any adverse effect upon the public interest, by abating or moving the feedlot
operation elsewhere on the 450 acres or another of the Holubecs' properties, was slight or trifling
at best. The Holubecs invoke the public interest only by stating that their lambs supply the San
Angelo slaughterhouse. Nothing in the record suggests however that the slaughterhouse cannot be
supplied from another location on the 450 acres or another Holubec property; and, no evidence
demonstrates the slaughterhouse will be seriously affected even if the Holubecs suspend feedlot
operations entirely. While the feedlot is a lawful and useful business, it was not shown to be
required for the public convenience or necessity, nor even profitable to the Holubecs personally. 
Similarly, nothing in the evidence demonstrates that the feedlot cannot be located elsewhere on the
450 acres or another Holubec property without affecting adversely another neighbor in the essentially
rural ranching area. Nor does the evidence show that the "necessity of others," in the words of
Storey, will not be met unless the Brandenburgers are compelled to live permanently under the
nuisance conditions. See Estancias Dallas Corp. v. Schultz, 500 S.W.2d 217, 222 (Tex. Civ.
App.--Beaumont 1973, writ ref'd n.r.e.). The Holubecs' actions appear willful to a serious degree,
resulting in an inconvenience or difficult situation that they themselves created. They located their
feedlot and deadpits next to their neighbor's existing home, admittedly without giving any thought
to the ill effects their operation might have on their neighbor; they spurned attempts to rectify the
problem in a mutually agreeable way; and, they offered at trial no alternate remedy to relocating the
feedlot and dead pits. 

 The legal remedy of damages appears to be inadequate. The Brandenburgers live
where they do by reason of Carl Brandenburger's employment as foreman of the large ranch on
which his residence is situated; the nuisance is continuing; and, damages would appear to be
inadequate to compensate for the hardship occasioned the Brandenburgers by their having to
relocate. The Brandenburgers' use and enjoyment of their residence is a substantial interest
adversely affected by the odors, flies, dust, and other conditions created by the feedlot. The
annoyance and discomfort caused them by the feedlot cannot reasonably be viewed as "slight" or
"trifling," in the words of Storey, and under the totality of the evidence, injunctive relief in the form
ordered by the trial court is the most tailored, practical, and efficient remedy for reconciling the
competing interest and claims. Or so the trial judge could reasonably conclude from the evidence. The Holubecs argue under the same heading that the jury's negative answer to
Question Four, inquiring as to the amount of money reasonably necessary to compensate the
Brandenburgers for personal discomfort, annoyance, inconvenience, and so forth, proximately caused
by the nuisance, renders the injunction measures ordered by the trial court disproportionate. This
contention rests upon an incorrect assumption. The jury's negative answer to Question Four does
not establish that the Brandenburgers sustained no injury by reason of the nuisance conditions. 
Under the instructions accompanying Question One, the jury could not have found that the feedlot
constituted a nuisance unless the jury also concluded the Brandenburgers' use and enjoyment of their
property was harmed by conditions that were offensive, discomforting, and annoying to persons of
ordinary sensibility, tastes, and habits of living in the locality. The jury's negative answer to
Question Four means no more than the Brandenburgers failed to carry their burden of establishing,
by a preponderance of the evidence, the amount of money inquired about. See Sterner v. Marathon
Oil Co., 767 S.W.2d 686, 690 (Tex. 1989); C & R Transport, Inc. v. Campbell, 406 S.W.2d 191, 194
(Tex. 1966).

 We hold the trial court did not abuse its discretion by an unreasonable balancing of
the equities and hardships.

 Finding no error, we affirm the trial-court judgment.



 

 John E. Powers, Justice

Before Justices Yeakel, Patterson and Powers*

Affirmed

Filed: August 30, 2001

Publish















* Before John E. Powers, Senior Justice, (retired), Third Court of Appeals, sitting by assignment. 
See Tex. Gov't Code Ann. § 74.003(b) (West 1998).
1. The plaintiffs in the trial court were William R. Lee, Laverne Lee, R&J Livestock
Company, and Batesville Farming Company, owners of undivided interests in a large ranch; and their
foreman Carl Brandenburger who lives in a dwelling on the ranch, joined by his wife Kathy
Brandenburger and their infant children Payton and Carson Brandenburger who appear by their
father as next friend.
2. Rule 278 continues with the following proviso: "provided, however, that objection to such
failure shall suffice in such respect if the question is one relied upon by the opposing party." Tex.
R. Civ. P. 278. It is obvious here that the Brandenburgers did not rely upon the affirmative defense
of section 251.004(a), the foundation of Question Eight, which the trial court submitted, and the
question requested by the Holubecs which the court refused to include in the charge.
3. Cf. Estancias Dallas Corp. v. Schultz, 500 S.W.2d 217, 219-21 (Tex. Civ.
App.--Beaumont 1973, writ ref'd n.r.e.); Ellen v. City of Bryan, 410 S.W.2d 463, 465-66 (Tex. Civ.
App.--Waco 1966, writ ref'd n.r.e.); King v. Miller, 280 S.W.2d 331, 335 (Tex. Civ.
App.--Eastland 1955, writ ref'd n.r.e.); and, Hall v. Muckleroy, 411 S.W.2d 390, 392-93 (Tex. Civ.
App.--Beaumont 1967, writ ref'd n.r.e.); Schiller v. Raley, 405 S.W.2d 446, 447 (Tex. Civ.
App.--Waco 1966, no writ); Garland Grain Co. v. D-C Home Owners Improvement Ass'n, 393
S.W.2d 635, 641-43 (Tex. Civ. App.--Tyler 1965, writ ref'd n.r.e.); Hill v. Villarreal, 383 S.W.2d
463, 465-67 (Tex. Civ. App.--San Antonio 1964, writ ref'd n.r.e.).